Turner vs Dr. Paul

17 CV 2434

.

Deposition of: Stamatia Richardson, M.D.

Taken on: December 12, 2017

**JENSEN LITIGATION SOLUTIONS**
180 North LaSalle Street
Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
**www.jensenlitigation.com**



Page 1

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3
   DARRYL TURNER,                    )
4                                    )
                    Plaintiff,       )
5                                    )
              vs.                    )   No. 2017 CV 2434
6                                    )
   DR. REENA D. PAUL, DR. STAMATIA   )
7  Z. RICHARDSON, GINA J. CHUNG,     )
   PA-C, DR. ELIZABETH FELDMAN, DR.  )
8  CONNIE MENNELLA, DR. KENYA KEY,   )
   DR. DAVID KELNER, NNEKA JONES     )
9  TAPIA, SANDRA NAVARRO, and COOK   )
   COUNTY,                           )
10                                   )
                    Defendants.      )
11

12

13          The deposition of STAMATIA RICHARDSON, M.D.,

14  called by the Plaintiff for examination, taken pursuant

15  to notice and pursuant to the Federal Rules of Civil

16  Procedure for the United States District Courts

17  pertaining to the taking of depositions, taken before

18  Kristi Landolina, Certified Shorthand Reporter,

19  Registered Professional Reporter, and Notary Public, at

20  2600 South California Street, 12th Floor, Chicago,

21  Illinois, commencing at 3:00 p.m. on the 12th day of

22  December, A.D., 2017.

23

24



Page 2

```
1   APPEARANCES:
2        ED FOX & ASSOCIATES
         MR. JONATHAN R. KSIAZEK
3        300 West Adams Street
         Suite 330
4        Chicago, Illinois 60606
         Phone:  (312) 345-8877
5        E-mail:  jksiazek@efox-law.com
6            On behalf of the Plaintiff;
7        STATE'S ATTORNEY OF COOK COUNTY
         MR. MICHAEL GORMAN
8        50 West Washington
         Suite 500
9        Chicago, Illinois 60602
         Phone: (312) 603-5440
10       E-mail:  michael.gorman@cookcountyil.gov
11           On behalf of the Defendant.
12
13
14
15              *    *    *    *    *    *
16
17
18
19
20
21
22
23
24
```

Page 3

```
1                   I N D E X
2    WITNESS                                     PAGE
3    STAMATIA RICHARDSON, M.D.
4        Direct Examination by Mr. Ksiazek ....... 4
5
6                E X H I B I T S
7    CHUNG DEPOSITION EXHIBIT                     PAGE
8        No. 4 (Interrogatory responses) ......... 45
9
10
11   Exhibit No. 4 was retained by Mr. Ksiazek
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                 (Witness sworn.)
2    WHEREUPON:
3              STAMATIA RICHARDSON, M.D.,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6                 DIRECT EXAMINATION
7    BY MR. KSIAZEK:
8        Q.   Good afternoon.  Can you please state and
9    spell your name for the record.
10       A.   I am Stamatia Richardson, S T A M A T I A,
11   last name is R I C H A R D S O N.
12       Q.   Dr. Richardson, have you ever given a
13   deposition before?
14       A.   Yes.
15       Q.   When was the last time?
16       A.   In the last two years.  I don't know exactly.
17       Q.   I'll explain the ground rules to you to
18   refresh your memory.  You may have discussed them with
19   counsel here.  I'm going to be asking you questions
20   related to your involvement and the allegations that
21   have been brought in the lawsuit involving Mr. Turner in
22   this case.  I would ask that you answer my questions
23   truthfully and to the best of your knowledge.  All
24   right?
```

Page 5

```
1        A.   Yes.
2        Q.   If you don't understand my question or hear my
3    question, please let me know, I'll do my best to reask
4    or rephrase the question.  If you answer the question,
5    I'll assume you heard it and understood it.  Is that
6    fair?
7        A.   Fair.
8        Q.   For the benefit of the court reporter, there's
9    a few rules we have to follow.  One is try to do your
10   best to give verbal responses, that means a yes or no
11   versus a shake of the head or nod or anything like that.
12   That's because she can't really take down nonverbal
13   responses.
14            Also, if you can do your best to wait until
15   I'm done asking a question before responding, that also
16   makes for the best transcript because it's difficult for
17   the court reporter to take down two people talking at
18   once.  I'll try my best to wait until you're done
19   answering, of course, before I ask another question.  If
20   you need to take a break for any reason, let me know,
21   that's not a problem.  The only rule with that is if
22   there's a question pending, you have to answer the
23   question before you take a break.  All right?
24       A.   Okay.
```



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017                                                      Pages 6..9

Page 6

1    Q.    You understand you're under oath today?
2    A.    Yes.
3    Q.    Is there anything preventing you from
4  testifying truthfully today?
5    A.    No.
6    Q.    Let me ask, did you do anything to prepare for
7  the deposition?
8    A.    I talked to my lawyer.
9    Q.    Did you review any documents?
10   A.    Yes, I did.
11   Q.    What did you review?
12   A.    The chart.
13   Q.    Mr. Turner's chart?
14   A.    Yes.
15   Q.    Did you review any records beyond the records
16  of your visit with Mr. Turner?
17   A.    Yes.
18   Q.    What else did you review?
19   A.    I reviewed his entire stay.
20   Q.    The entire record?
21   A.    I did.
22   Q.    When you met with counsel, was anyone else
23  present?
24   A.    No.

Page 7

1    Q.    How long did you meet with counsel?
2    A.    About half an hour.
3    Q.    Let me get some of your background.  What is
4  your highest level of education?
5    A.    I'm a physician.
6    Q.    When did you graduate from medical school?
7    A.    1986.
8    Q.    Where did you graduate from?
9    A.    1986 -- I'm sorry.  1990.  I graduated from
10  the Loyola Stritch School of Medicine.
11   Q.    Where did you go for your undergraduate
12  degree?
13   A.    Loyola University in Chicago.
14   Q.    What year did you graduate?
15   A.    1986.
16   Q.    After you graduated from medical school, did
17  you do a residency?
18   A.    I did a residency in family medicine.
19   Q.    Where is that at?
20   A.    St. Joseph's -- What was it called then?
21  St. Joseph's Hospital.  It was part of the Northwestern
22  network at that time.  It was a family practice
23  residency.
24   Q.    Where is that located?

Page 8

1    A.    At 2800 -- Lake Shore Drive and Diversey.  I'm
2  not sure of the address anymore.
3    Q.    Chicago, that's fine.
4    A.    Yes, it's in Chicago.
5    Q.    How long was your residency?
6    A.    Three years.
7    Q.    After your residency, where did you work?
8    A.    I worked here.
9    Q.    For the county?
10   A.    For the county.
11   Q.    So you started with the county, was it --
12   A.    August of 1993.
13   Q.    What was your position when you started with
14  the county?
15   A.    Attending physician.
16   Q.    Where did you start working?
17   A.    I'm sorry?
18   Q.    What location did you work at for the county?
19   A.    I worked for Cermak Health Services.
20   Q.    You're still employed at Cermak?
21   A.    Yes.
22   Q.    Had worked at Cermak from '93 to the
23  present?
24   A.    Yes, I have.

Page 9

1    Q.    Has your title ever changed?
2    A.    A few times.
3    Q.    Can you walk me through that?
4    A.    In '96 I became a senior attending.  In '90 --
5  sorry -- 2008 -- what was my title?  It was still senior
6  attending but I had a different grade level.  Then in
7  May of 2016 I became divisional chairman over the
8  Department of Correctional Medicine.
9    Q.    In 2008, when you received a higher grade as a
10  senior attending physician, did that change your duties
11  at all?
12   A.    Yes.
13   Q.    How so?
14   A.    I became in charge of the methadone program,
15  OTP it's called, opiate treatment program at Cermak.
16   Q.    Was that in addition to your other duties as a
17  physician?
18   A.    Yes.
19   Q.    When you became a divisional chair in May
20  of 2016, how did your duties change at that time?
21   A.    I became more administrative.
22   Q.    Can you describe what administrative functions
23  you performed?
24   A.    So I had studied and got a board certified --

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Page 10

1 board certification in addiction medicine in that year I
2 started and did the policies for the detox unit at the
3 jail and have further done more addiction work since
4 then. I also have quality-type projects that I have to
5 do.
6    Q.    Can you give me an example?
7    A.    I might look through urgent care quality with
8 one of my colleagues or chronic disease measures.
9    Q.    Evaluating the care that's being given?
10   A.    Yes.
11   Q.    You mentioned you have a board certification
12 in addiction medicine?
13   A.    Uh-huh. Yes.
14   Q.    That was in 2016?
15   A.    I got that in 2015, October of 2015.
16   Q.    Are you board certified in any other areas?
17   A.    Family practice.
18   Q.    Has your license ever been suspended?
19   A.    No.
20   Q.    Are you licensed to practice in any other
21 states?
22   A.    No.
23   Q.    Besides Illinois?
24   A.    (No verbal response.)

Page 11

1    Q.    That's a no?
2    A.    That's a no.
3    Q.    So can you briefly describe what your duties
4 were as a senior attending physician at Cermak?
5    A.    I basically run the methadone program. I was
6 a methadone director and I did the CQI for that project.
7 I also did regular primary care work.
8    Q.    CQI meaning?
9    A.    Continued quality work related to the
10 methadone program.
11   Q.    As a senior attending physician, do you also
12 see patients regularly in the clinic?
13   A.    Yes.
14   Q.    Would that be the general clinic or specialty
15 clinic?
16   A.    Both.
17   Q.    When you were a senior attending physician,
18 how often would you work in the general clinic?
19   A.    It depends. If it happens to be New Year's
20 Eve, apparently quite a lot.
21   Q.    Sorry to hear that. Would there be a regular
22 schedule you have, like one day a week or multiple or
23 just random?
24   A.    It's random.

Page 12

1    Q.    Would you spend more of your time in the
2 methadone clinic?
3    A.    No. Not particularly, no.
4    Q.    Do you get to choose where you go or is that
5 something that you're told?
6    A.    I cover the methadone clinic every time and
7 any other time wherever I'm needed.
8    Q.    How often is the methadone clinic --
9    A.    Twice a week.
10   Q.    Do you work --
11   A.    I'm sorry. What does this have to do with
12 Mr. Turner?
13   Q.    Just getting some background as to what your
14 specialty is.
15   A.    Okay.
16   Q.    So do -- Other than the general clinic and
17 methadone clinic, you don't work in any other specialty
18 clinics?
19   A.    No, no other specialty clinics. I do urgent
20 care. I do receiving work.
21   Q.    Do you supervise any physicians in your
22 current position?
23   A.    No. In my current position, I'm sorry, yes.
24   Q.    What physicians do you supervise?

Page 13

1    A.    I'm one of the ones that can supervise.
2 There's three of us that are divisional chairs.
3    Q.    How many physicians are under your
4 supervision?
5    A.    We all supervise all the physicians underneath
6 us, so it depends what project we're working on.
7    Q.    What number -- Strike that.
8         How many physicians overall are in Cermak at
9 this time?
10   A.    Between 12 and 15 is my guess.
11   Q.    Do you also supervise the physician's
12 assistants?
13   A.    Yes.
14   Q.    How many physician's assistants are there at
15 Cermak currently?
16   A.    Between 15 and 18.
17   Q.    Do you have any supervisory function over the
18 nurses?
19   A.    No.
20   Q.    So when you would see a patient or detainee in
21 the general clinic, your duties would be to assess the
22 patient and treat them accordingly?
23   A.    I would be the treating provider, yes.
24   Q.    If a patient or detainee who came into the



Page 14

1  general clinic needed a referral for some type of
2  specialty treatment, can you walk me through the steps
3  that you would go through?
4      MR. GORMAN:  Objection, form, foundation, calls for
5  speculation, improper hypothetical.
6          That being said, if you understand the
7  question, you can answer.
8  BY THE WITNESS:
9      A.   You order a referral.
10     Q.   If you order a referral, is it something you
11 do through the computer system?
12     A.   Are you asking at a specific time?  That's
13 changed.
14     Q.   Let's talk about currently, then back when you
15 saw Mr. Turner.
16     A.   I know now we can order it through the
17 computer system.  There was a time -- I couldn't tell
18 you when -- when that changed.  I don't have that to
19 memory.
20     Q.   So my records and the medical records have you
21 seeing Mr. Turner on 12/30/2015.  Do you know what the
22 system in place for referrals was at that time?
23     A.   I don't.
24     Q.   What was the prior system, to your knowledge?

Page 15

1      A.   So we had several systems.  One, you know, if
2  someone came back from the hospital and had a system, we
3  would call the scheduler.  It's called Iris.
4      Q.   Is that simply a different type of computer
5  system for the medical records?
6      A.   No, it's not for the medical records.  It was
7  for the Cook County Health and Hospital Systems.  So
8  they had multiple ambulatory clinics, they have
9  inpatient patients, they have the Cermak patients, so it
10 was kind of a bucket that would hold all the referrals
11 and the system organized it and gave people
12 appointments.
13     Q.   I see.  If you saw Mr. Turner at a point in
14 time when Iris was in effect, would you have to go into
15 Iris to order a referral at that time?
16     A.   Only if it was the first time he needed that
17 referral.
18     Q.   If it was a subsequent time when he already
19 had a referral, what steps could you take to make sure
20 he sees the specialist?
21     A.   I would message the scheduler and ask what is
22 going on with the system and she would figure it out.
23     Q.   The scheduler, is that one person?
24     A.   Our main specialty clinic out of Cermak

Page 16

1  specialty person was one person but she's often covered
2  by other people as well if she's on vacation.
3      Q.   Is her name Laura Hernandez?
4      A.   Yes.
5      Q.   So if you wanted to ensure that a patient saw
6  a specialist, you could speak with Ms. Hernandez?
7      A.   I can ask her to contact their system, yes.
8      Q.   You could go to Ms. Hernandez to make sure a
9  patient was scheduled for certain events?
10     A.   Yes.
11     Q.   Would you ever take any steps to make sure
12 Ms. Hernandez followed up on your request to schedule
13 someone?
14     MR. GORMAN:  Objection, form, foundation, calls for
15 speculation, calls for a hypothetical.
16          If you understand --
17 BY THE WITNESS:
18     A.   That would depend on the case.  If something
19 is more urgent or emergent, then I would obviously check
20 with her a few days later to make sure she got the
21 message.
22     Q.   It wasn't as urgent, would you sometimes not
23 follow up with her?
24     MR. GORMAN:  Objection, form, foundation, again,

Page 17

1  calls for speculation, improper hypothetical.
2          That being said, if you understand, you can
3  answer.
4  BY THE WITNESS:
5      A.   Yes, if it was something elective that could
6  wait -- We would always follow up at the next clinic
7  appointment.
8      Q.   What was your method of communicating with
9  Ms. Hernandez, meaning would you call her or leave a
10 note or send an electronic message?
11     A.   Sometimes all three.
12     Q.   Was there a preferred method you used or
13 either one?
14     A.   I usually called her.  If she wasn't at her
15 desk at that moment or on the phone, I would go to the
16 other two.
17     Q.   When you called Ms. Hernandez about a certain
18 patient, would you document that in any way?
19     MR. GORMAN:  Objection, form, foundation,
20 incomplete, hypothetical, calls for speculation.
21          That being said, if you understood, you can
22 answer.
23 BY THE WITNESS:
24     A.   I would often in my note write -- it was my



Page 18

1  general documentation, I would write in my note that I
2  contacted her.
3      Q.   Other than speaking to Ms. Hernandez to follow
4  up on a scheduling appointment, were there any other
5  actions you could take to make sure that a patient who
6  needed to see a specialist could make that appointment?
7      A.   Again, that would depend on the urgency of
8  whatever is happening in front of me.
9      Q.   Can you explain what you mean by that?
10     A.   So I think you have an appendicitis and you
11  need surgery tomorrow, I have to do a little more than
12  call someone.  If it's something that could wait a week
13  or a month or a year, then I would wait for the system
14  to work and I would call you back for an appointment and
15  we can follow up on what happened.
16     Q.   So if it's something you felt needed immediate
17  attention, you could make sure that that person went to
18  the hospital, for example?
19     A.   Or I could call the -- The hospital has
20  specialists on call.  So if you weren't sure if
21  something needed immediate attention, you could call and
22  get a consult that way.
23     Q.   But you had the ability to send someone to the
24  hospital if you felt it was an emergency?

Page 19

1      A.   Yes.
2      Q.   We talked about scheduling appointments with
3  specialists.  Did you have any involvement with
4  scheduling surgeries for patients?
5      A.   No.
6      Q.   Did you have an understanding as to how
7  surgeries were scheduled if someone needed a surgery who
8  was at Cermak?
9      A.   Very roughly.  Not the details of anything.
10     Q.   Can you give me your rough knowledge of that?
11     A.   The understanding I had is if a patient was
12  scheduled for an elective surgery, it would depend on
13  sometimes OR time, county -- Stroger Hospital is a
14  trauma center.  Oftentimes OR trauma or an emergency
15  would reallocate how resources were used.
16     Q.   In your position as an attending physician,
17  could you refer someone out for surgery?
18     A.   No.  I could refer them to the surgical clinic
19  to get an opinion about a surgery.
20     Q.   So the specialists would be the one to refer
21  someone for surgery?
22     A.   Yes, they schedule their surgeries.
23     Q.   The specialists schedule the surgeries?
24     A.   The person doing the surgery.

Page 20

1      Q.   I see.
2      A.   So the cardiologist can't schedule for the
3  podiatrist, different parts of the body.  Whoever is
4  doing the surgery, that clinic, has to schedule their
5  own surgeries.
6      Q.   Right.  Do you have any knowledge how the
7  specialists schedule their surgeries?
8      A.   No.
9      Q.   When you see a patient for a follow-up
10  visit --
11     A.   Yes.
12     Q.   -- would you review their prior medical
13  records when visiting with someone?
14     A.   Yes.
15     Q.   Do you review the entire medical history of a
16  patient?
17     A.   So we have chronic disease appointments, so if
18  you have a chronic disease, we would be looking at the
19  chronic disease notes.  Sometimes there's just a simple
20  walk-in appointment for a particular problem and then
21  the whole chart will not be reviewed.
22     Q.   You're not board certified as an ENT; is that
23  right?
24     A.   No, I'm not.

Page 21

1      Q.   One of the specialty clinics in Cermak is
2  called plastics, right?
3      A.   No, we don't have plastics at Cermak.
4      Q.   Is there an ortho clinic?
5      A.   Yes, there is.
6      Q.   Can you explain what the ortho clinic does at
7  Cermak?
8      A.   Sorry.  What does that have to do with
9  Mr. Turner?
10     Q.   That was one of the places he was referred to.
11     A.   I see.  There's a specialist or a PA or a
12  nurse practitioner that works with the specialist that
13  determines care -- orthopedic care.
14     Q.   There's also a plastic surgery clinic at --
15     A.   No, there is no plastic surgery clinic at
16  Cermak.  That was the question before this one.
17     Q.   Right.  I guess I wasn't clear on plastics
18  versus plastic surgery.  Is it your understanding that
19  plastic surgery is at Stroger or is it somewhere else?
20     A.   It's at Stroger, yes.
21     Q.   You have in front of you what was marked as
22  Exhibit 1 for Ms. Chung's deposition.  These are some of
23  Mr. Turner's medical records that we'll look at in the
24  case.  Before we start to look at them, do you have an



Page 22

1 independent recollection of your visit with Mr. Turner?

2     A.   I do not.

3     Q.   In reviewing the record for Mr. Turner, did it

4 refresh your memory at all of your visit with him?

5     A.   No. I rarely cover this division. That's why

6 I remembered it was near New Year's Eve. It's an area I

7 almost never cover.

8     Q.   That was likely why you saw him that day

9 basically?

10     A.   Yes.

11     Q.   Your record of your visit with Mr. Turner

12 starts on the page Bates 419 in Exhibit 1 from Chung's

13 deposition six pages in. This would be a record

14 starting at the bottom of 419 from 12/30/2015, right?

15     A.   Yes.

16     Q.   That was the date that you saw Mr. Turner?

17     A.   Yes.

18     Q.   Your name is signed on the electronic record;

19 is that right?

20     A.   Yes, it is.

21     Q.   The time listed on your electronic signature,

22 which we're looking at on Bates 422, is 12:07 p.m. or

23 just after noon?

24     A.   Yes.

Page 23

1     Q.   Let's turn to 419 again. Under basic

2 information it lists the visit type as scheduled

3 follow-up, correct?

4     A.   Yes.

5     Q.   This was a follow-up visit for Mr. Turner,

6 correct?

7     A.   Yes.

8     Q.   Are those types of visits scheduled in the

9 computer ahead of time, to your knowledge?

10     A.   Most of the time, yes.

11     Q.   It's not something, for example, where he

12 would request to see you specifically?

13     A.   Yes.

14     Q.   What I said is correct?

15     A.   Yes.

16     Q.   If you turn to the next page on Bates 420,

17 there's a section at the top titled subjective, correct?

18     A.   Yes.

19     Q.   Now, this has a problem list for Mr. Turner.

20 Are these problems prepopulated, to your knowledge?

21     A.   Yes.

22     Q.   The problems listed here are asthma, seizure,

23 and chronic pain of right knee, correct?

24

Page 24

1     Q.   Now, the reason we're here is for Mr. Turner's

2 nose. Do you know why the nose isn't listed here?

3     A.   It's not a chronic problem.

4     Q.   Meaning that it was something that he only

5 started dealing with in October of 2015?

6     A.   Yes.

7     Q.   Next section is titled history of present

8 illness, correct?

9     A.   Yes.

10     Q.   This is a section you would prepare?

11     A.   Yes.

12     Q.   And you prepared this in this case?

13     A.   Yes.

14     Q.   You indicate in your section of history of

15 present illness the patient presents with chronic right

16 knee pain. Then you say, Per ortho on 12/2, awaiting

17 Ortho Fracture at Fantus. When you say per ortho on

18 12/2, would that be something you received from a prior

19 medical record or from speaking to ortho?

20     A.   No, from his record.

21     Q.   Ortho meaning the ortho clinic?

22     A.   At Cermak.

23     Q.   At Cermak. Based on the record from the ortho

24 clinic at Cermak, you were aware Mr. Turner was

Page 25

1 awaiting -- you say Ortho Fracture at Fantus. What's

2 Ortho Fracture?

3     A.   That's the name of the clinic at Fantus.

4     Q.   He was awaiting an appointment at the Ortho

5 Fracture Clinic?

6     A.   Yes.

7     Q.   Fantus is the specialty clinics?

8     A.   It's the outpatient arm of Stroger, yes.

9     Q.   Do you know what Mr. Turner had to do to

10 receive an appointment at Ortho Fracture?

11     A.   I don't think he had to do anything.

12     Q.   So what would have to happen for Mr. Turner to

13 see the Ortho Fracture Clinic, if you know?

14     A.   I believe the referral would be made from the

15 ortho clinic at Cermak to the ortho -- I don't know if

16 they do it internally themselves or if they go through

17 our scheduler. I have no idea that part.

18     Q.   The next line indicates, asthma, patient

19 without C/O. Is that cough?

20     A.   Complaining of.

21     Q.   Patient without complaining of wheezing. Then

22 you indicate plus SOB --

23     A.   Shortness of breath.

24     Q.   -- from nasal fracture. Based on your


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Pages 26..29

Page 26

1  evaluation of Mr. Turner here, he had shortness of
2  breath from his nasal fracture at that time?
3      A.   Yes.
4      Q.   You indicate here, Nasal fracture.  Patient
5  last seen on 11/20 for preop.  Needs surgery date.
6           What is preop?
7      A.   That's the clinic he goes to to get labs or
8  X-rays or anything else he needs before surgery to clear
9  him for surgery.
10     Q.   Are you aware as to what preop does to prepare
11 him for surgery?
12     A.   It's whatever X-rays or labs the surgeon
13 wants.
14     Q.   It's specific to the surgery that he would
15 receive?
16     A.   Yes.
17     Q.   Based your indication here, you were aware
18 that Mr. Turner needed surgery for his nasal fractures,
19 correct?
20     A.   Yes.
21     Q.   He was simply awaiting a surgery date as of
22 this visit?
23     A.   Yes.
24     Q.   To your knowledge, how would Mr. Turner obtain

Page 27

1  a surgery date?
2      MR. GORMAN:  Objection, form and foundation, calls
3  for speculation, improper hypothetical.
4           That being said, if you understand, you can
5  answer.
6  BY THE WITNESS:
7      A.   I believe the surgeon will schedule his
8  surgery.
9      Q.   The specialist as you described?
10     A.   Yes.  Uh-huh.
11     Q.   The next section is titled histories.  This is
12 a history of medications that Mr. Turner was taking at
13 the time and previous?
14     A.   Yes.
15     Q.   Under inpatient medications it lists albuterol
16 as one of the medications, correct?
17     A.   Yes.
18     Q.   That's for the asthma?
19     A.   Yes.
20     Q.   You indicate for shortness of breath?
21     A.   Yes.
22     Q.   As he indicated, Mr. Turner had shortness of
23 breath from his nasal fracture, correct?
24

Page 28

1      Q.   Amitriptyline, what is that medicine?
2      A.   It's a medicine for seizures.
3      Q.   Beclomethasone, that's also for asthma?
4      A.   Yes, it is.
5      Q.   A couple creams listed, correct?
6      A.   Just one.
7      Q.   That's emollients?
8      A.   Yes.
9      Q.   What is Levetiracetam?
10     A.   Also a medicine for his seizures.
11     Q.   I see.  What is zafirlukast?
12     A.   That's a medicine for his asthma as well.
13     Q.   Are there any pain medicines Mr. Turner was on
14 at this time?
15     A.   No.
16     Q.   Before you saw Mr. Turner, would a nurse or
17 medic have taken Mr. Turner's vital signs?
18     A.   Yes.
19     Q.   If you turn to the next page on Bates 421, we
20 see the vital signs present there?
21     A.   Yes.
22     Q.   In viewing these vital signs, as you sit here
23 today, does anything appear to be abnormal?
24     A.   No.

Page 29

1      Q.   Let's turn to the next page.  You did a
2  physical exam of Mr. Turner on this date?
3      A.   Yes.
4      Q.   Part of your physical exam involved an exam of
5  Mr. Turner's head, ear, nose, and throat?
6      A.   Uh-huh.
7      Q.   Is that right?
8      A.   Yes.
9      Q.   So looking at the top of Bates 422, this is a
10 continuation of a section titled general, which starts
11 on the previous page, so under that section you put
12 normally developed?
13     A.   Uh-huh.
14     Q.   What does that mean when something is normally
15 developed?
16     A.   He had no obvious deformities.
17     Q.   Fair enough.  Turning to the next page under
18 422, under appearance you indicate in mild distress?
19     A.   Yes.
20     Q.   Why did you write that?
21     A.   He was complaining of shortness of breath.
22     Q.   Was the mild distress indicative of anything
23 else, such as pain?
24     A.   Oh, I don't know.


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017                                      Pages 30..33

Page 30

1    Q.   So then the next line is HENT or head, ear,
2  nose, throat, correct?
3    A.   Yes.
4    Q.   What physical exam do you perform of the --
5    A.   Sounds like I palpated his -- the area under
6  his eyes and his nose.
7    Q.   Palpate meaning touch those areas?
8    A.   Uh-huh.
9    Q.   You noted positive infraorbital tenderness.
10 What does that mean?
11   A.   He was tender under his eyes.
12   Q.   The plus sign meaning he was tender?
13   A.   Yes.
14   Q.   The next part says, Positive for tender nasal
15 bones?
16   A.   Yes.
17   Q.   So he was also tender in his nasal area?
18   A.   Yes, he was.
19   Q.   When you say "nasal bones," is there a
20 specific area of the nose or all over, if you know?
21   A.   All over.  The nasal bones end where the
22 cartilage starts.
23   Q.   So the top of the nose?
24   A.   Yes.

Page 31

1    Q.   The next section is respiratory.  You note
2  wheezes and bronchi throughout?
3    A.   Yes, I do.
4    Q.   What is bronchi?
5    A.   A rougher wet sound.
6    Q.   Would that condition be due to his nasal
7  injury, if you know?
8    A.   No.
9    Q.   That would be like a cold or --
10   A.   Probably related to his chronic obstructive
11 pulmonary disease.
12   Q.   I see.  There's a section below a few lines,
13 impression and plan.  This is your assessment and plan,
14 correct?
15   A.   Yes.
16   Q.   You indicate, diagnosis, asthma, COPD, which
17 you discussed, seizure disorder, chronic knee pain, and
18 0recent nasal fracture.  Were you able to determine how
19 recent the nasal fracture was?
20   A.   I think at the time, yes.  I can't tell in the
21 middle of the chart right now.
22   Q.   If you turn to the first page of Exhibit 1,
23 I'll state for the record this is the date of the
24 incident, so it would have been October 25, 2015.  Does

Page 32

1  that refresh your memory as to that?
2    A.   Yes.
3    Q.   When you saw Mr. Turner, it was just over two
4  months after he received his broken nose?
5    A.   Yes.
6    Q.   You indicate under recent nasal fracture,
7  Patient needs plastics scheduled, patient awaiting Ortho
8  Fracture, correct?
9    A.   Yes.
10   Q.   That means he needed to see the specialist in
11 the plastics clinic?
12   A.   Yes.
13   Q.   That would be at Cermak; is that right?
14   A.   No.
15   Q.   In --
16   A.   At Stroger.
17   Q.   Excuse me.  Then the Ortho Fracture Clinic in
18 Cermak?
19   A.   No.
20   Q.   Or Stroger?
21   A.   In Stroger.  Both those clinics are at
22 Stroger.
23   Q.   So would you have had any ability to schedule
24 those appointments?

Page 33

1    A.   To schedule them?
2    Q.   Yes.
3    A.   No.
4    Q.   Would you have any ability to ensure that
5  Mr. Turner went to those appointments?
6        MR. GORMAN:  Objection, form, and foundation,
7  improper hypothetical, calls for speculation.
8        That being said, if you understand it, you can
9  answer.
10 BY THE WITNESS:
11   A.   No.
12   Q.   Did you have an understanding as to whether
13 one of those appointments was already scheduled, whether
14 plastics or with the fracture clinic?
15   A.   No, I don't think either one of them was
16 scheduled at that day.
17   Q.   Did you take any actions after your
18 appointments with Mr. Turner on December 30th to ensure
19 he went to the specialty clinics?
20   A.   So I don't remember but my common practice is
21 to either call, e-mail, or electronically somehow leave
22 a note for a scheduler.
23   Q.   As you say, you aren't sure whether that
24 occurred in this case?



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Pages 34..37

Page 34

1    A.   I'm not sure if I did that.
2    Q.   **Yes.**
3    A.   I'm almost positive I did that; otherwise, I
4 would have said otherwise.
5    Q.   **You would have said if you did not --**
6    A.   It's my common practice when someone is
7 waiting for an appointment to call scheduling.
8    Q.   **For example, here when Mr. Turner was awaiting**
9 **an appointment with the Ortho Fracture Clinic, your**
10 **practice would have been to send them a note?**
11    A.   Yes, of some sort.
12    Q.   **You would have sent that note to**
13 **Ms. Hernandez?**
14    A.   Yes.
15    Q.   **Do you know if you followed up with**
16 **Ms. Hernandez if you did reach out to her about**
17 **scheduling the plaintiff for these specialty clinics?**
18    A.   I don't remember. But it would not have been
19 my practice to do that on a case I didn't think was
20 emergent. I would have just given him another
21 follow-up.
22    Q.   **You noted this was a case you did not feel was**
23 **emergent?**
24    A.   No, I did not.

Page 35

1    Q.   **Why not?**
2    A.   I didn't think 24 or 48-hour type of
3 intervention would have made any difference.
4    Q.   **Did you believe plaintiff needed the surgery**
5 **for his nose?**
6    A.   Eventually, yes.
7    Q.   **When you say "eventually," if plaintiff did**
8 **not receive surgery for his nose, do you believe that**
9 **would have impacted his pain levels?**
10    MR. GORMAN: Objection, form, foundation, calls for
11 speculation, it's an improper hypothetical.
12    That being said, if you understand the
13 question, you can answer.
14 BY THE WITNESS:
15    A.   The reason he needs the surgery is not to
16 decrease his pain. It's to have a good outcome in terms
17 of his ability to breathe or whether his nose is
18 deviated to be able to in long-term -- It has nothing to
19 do with his pain. His pain is not necessarily going to
20 change. As a matter of fact, you're going to make it
21 worse initially with surgery.
22    Q.   **But if the surgery did not occur, plaintiff**
23 **would have continued to have difficulty breathing due to**
24 **his injury, correct?**

Page 36

1    MR. GORMAN: Objection, form, foundation, calls for
2 speculation, improper hypothetical.
3    That being said, you can answer if you can.
4 BY THE WITNESS:
5    A.   Not everyone has a bad outcome from fractures.
6 Not every surgery necessarily is going to make it
7 better.
8    Q.   **Did you know what the impact of surgery would**
9 **be on the plaintiff in this case?**
10    A.   No. I'm speaking in generalities.
11    Q.   **Now, you did know when you saw plaintiff that**
12 **he was in some distress, right?**
13    A.   Yes.
14    Q.   **He was still tender two months post the**
15 **accident?**
16    A.   Yes.
17    Q.   **He was having trouble breathing two months**
18 **post the incident?**
19    A.   Yes, I do not think my exam has anything to do
20 with his nose. He had wheezes and bronchi in his lungs.
21 It had nothing to do with his nose.
22    Q.   **Just going back to the history of present**
23 **illness on 420.**
24    A.   That's the history of the patient, right. The

Page 37

1 patient is complaining of shortness of breath and he
2 claims it's from his nasal fracture. You can always
3 open your mouth and breathe. He's having a hard time
4 breathing. He's having problems with his asthma and
5 COPD.
6    Q.   **Where it says trouble breathing from nasal**
7 **fracture, was that your determination or was that**
8 **someone else's?**
9    A.   That's the history I get from the patient.
10    Q.   **Okay. So that's what he told you?**
11    A.   That's what he told me.
12    Q.   **But you didn't believe him?**
13    A.   My physical -- I don't not believe my patients
14 but my physical exam did not go with that.
15    Q.   **So you're saying the trouble breathing was**
16 **from his COPD?**
17    A.   I think so.
18    Q.   **What is that based on?**
19    A.   Wheezes and bronchi do not come from a
20 fracture. That's his disease.
21    Q.   **If someone has swelling in their nose, would**
22 **that cause difficulty breathing?**
23    A.   It shouldn't if you can open your mouth and
24 breathe through your mouth.


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Pages 38..41

Page 38

1    Q.    Breathing through the nose --
2    A.    It might not be pleasant.  It might hurt.  It
3  should not cause bronchi or wheezing.  The difficulty
4  breathing or shortness of breath is a subjective
5  feeling.  In his case, though, he had physical findings
6  he was having a hard time breathing.
7    Q.    So December 30, 2015 was the only time you saw
8  Mr. Turner, correct?
9    A.    Yes.
10   Q.    Did you ever follow up with his treatment in
11 any way?
12   A.    No.
13   Q.    Did you ever determine whether he was referred
14 for surgery?
15   A.    No.
16   Q.    So based on your examination of Mr. Turner on
17 December 30, 2015, were you able to make a determination
18 regarding whether he needed surgery at that time?
19   A.    I -- It was not for my exam or my own
20 specialty.  I was only observing he had gone to clinic
21 and they wanted him to have surgery.
22   Q.    That was the opinion of the specialist at the
23 time?
24   A.    Yes.

Page 39

1    Q.    I want to look at the medical record
2  immediately prior to your visit, which starts on Bates
3  Turner 416.  Are you with me on that?
4    A.    Yes.
5    Q.    Now, starting at the middle of the page,
6  there's a record of a visit from November 19, 2015 of
7  Mr. Turner with a Dr. Reena Paul?
8    A.    Okay.
9    Q.    Do you know a Dr. Paul?
10   A.    I do know Dr. Paul.
11   Q.    Would this record from November 19, 2015 been
12 a record that you reviewed during your visit on
13 December 30th?
14   A.    Let me make sure she signed it.  Yes.
15   Q.    It appears based on these records that
16 Mr. Turner's visit with Dr. Paul was the most recent
17 outpatient visit that Mr. Turner had with the medical
18 clinic, correct?
19   A.    Yes.
20   Q.    Other than the ortho visit we talked about on
21 12/2?
22   A.    I've only seen piecemeal, so I'm assuming
23 you're correct.
24   Q.    I'm just referring to your note of the HPI.

Page 40

1    A.    Yes.
2    Q.    If you can turn to 419, which has the end of
3  Dr. Paul's record at the top and your record on the
4  bottom.  Dr. Paul, in her impression and plan on
5  November 19, 2015, under section and plan -- impression
6  and plan said, Follow-up anesthesia preop clearance,
7  comma, plastic surgery?
8    A.    Yes.
9    Q.    So that would have been something you read in
10 your visit with Mr. Turner on December 30th?
11   A.    Yes.
12   Q.    What is anesthesia preop clinic?
13   A.    That's the clinic I mentioned about him going
14 to -- Preop needs surgery date.  So she had gotten his
15 preop.  She missed it, I think.  On November 20 he got
16 his preop visit.
17   Q.    Okay.
18   A.    It depends -- Sometimes it depends on how old
19 the lab work is that the surgeon wants.  Sometimes you
20 have to repeat it if it's too old.  November 20 to
21 December 20, he may have needed more preop at that
22 point.
23   Q.    It was your understanding that -- Well, if
24 Dr. Paul saw Mr. Turner on November 19th and according

Page 41

1  to your note --
2    A.    He got seen the next day.  I see.  I see.
3    Q.    So he would have gone through clearance on the
4  20th, the next day, and do you know what happens in
5  between November 20 and the date you saw Mr. Turner on
6  the 30th other than him going to the ortho clinic?
7    A.    He went for his preop clinic and then he needs
8  a surgery date at that point.
9    Q.    He would go to the preop clinic and then to
10 the ortho clinic to get a surgery date?
11   A.    No.  The ortho clinic isn't related to the
12 preop clearance.  The preop is for his nasal fracture.
13   Q.    Right.  Ortho is not for his nasal you're
14 saying?
15   A.    No.  The ortho is for his knee.
16   Q.    I think you're right.  The way that I read
17 those, the chronic right knee pain, it says, awaiting
18 Ortho Fracture.  I guess that's maybe why I'm a little
19 confused.  It says Ortho Fracture at Fantus.  Do you
20 think the Ortho Fracture is for the nose or the knee?
21   A.    If it's under -- It says chronic right knee
22 pain, per ortho was seen on December 2nd and waiting to
23 see the specialist at Fantus.  It has nothing to do with
24 his nasal fracture for which he had preop clearance on



Page 42

1   November 20th and now needs his surgical date.
2       Q.    Fair enough.  I see.  The fracture thing threw
3   me off.
4       A.    Right.  A lot of times the surgical date is
5   called in.  They don't just assign them.
6       Q.    What do you mean by called in?
7       A.    So because it's elective, because it's not
8   emergent, and they have emergent ORs happening all the
9   time, sometimes they will look a week at a time and
10  choose a date but it's not that unusual at all not to
11  have a surgical date.
12      Q.    Looking back at 419 in Exhibit 1, Dr. Paul did
13  note that one of the plans for Mr. Turner was to have a
14  plastic surgery on his nose, correct?
15      A.    Yes.
16      Q.    When you saw Mr. Turner, he had not yet had
17  the surgery?
18      A.    No.
19      Q.    Did you ever learn whether Mr. Turner received
20  the surgery?
21      A.    Only after I read his record after I got
22  named.
23      Q.    And that was, to your knowledge, after
24  Mr. Turner left Cook County Jail, right?

Page 43

1       A.    Yes.
2       Q.    Do you have any direct knowledge as to why
3   Mr. Turner did not receive his surgery while he was in
4   Cook County Jail?
5       A.    No.
6       Q.    You have no explanation for why that did not
7   take place?
8       A.    No.  My assumption in all these cases is when
9   they are elective, they are done when there is time and
10  personnel and no other emergent cases bumping cases.
11      Q.    Who makes the decision whether a surgery is
12  elective or emergent?
13      A.    The specialist.
14      Q.    Had you ever seen any orders from a Cook
15  County judge relating to Mr. Turner's medical treatment?
16      A.    No.
17      Q.    Did you speak with any administrative staff
18  regarding the need for Mr. Turner to receive surgery
19  while he was in Cook County Jail?
20      A.    No.
21      Q.    Other than your visit with Mr. Turner on
22  December 30th, 2015, did you have any other follow-up
23  that we haven't discussed?
24      A.    No.

Page 44

1       Q.    Did you have any further conversations
2   regarding Mr. Turner and his treatment that we haven't
3   mentioned?
4       A.    No.
5       Q.    Can you describe what a deviated septum
6   turbinate obstruction is?
7       A.    Meaning?  It's very self-evident to a medical
8   person.
9       Q.    I know.  For the record, if you can get in
10  layman's terms what that means?
11      A.    That the middle part of the nose that
12  separates one side from the other is moved to the one
13  side.
14      Q.    So there's a type of surgery called
15  septorhinoplasty, right?
16      A.    Yes.
17      Q.    Can you explain what that surgery entails?
18      A.    No.  I'm not a surgeon.  I'm not a specialist
19  in this area.
20      Q.    Are you familiar with what a turbinate
21  reduction would entail?
22      A.    No.
23      Q.    Other than the distress that you noted in your
24  record, is there any other pain that Mr. Turner

Page 45

1   described to you in your visit?
2       A.    I don't have a memory of the visit.
3       Q.    Would you have documented something in your
4   record if Mr. Turner told you he was in pain?
5       A.    I hope so.
6       Q.    That's your practice, right?
7       A.    Yes.
8                     (Chung Deposition Exhibit No. 4
9                      marked as requested.)
10  BY MR. KSIAZEK:
11      Q.    I have handed you what's been marked as
12  Richardson 4, it contains your responses to
13  interrogatories in this case, correct?
14      A.    Sorry.  I don't see those.
15      Q.    If you look on the first page, the document is
16  titled Defendant Dr. Stamatia Richardson Answers to
17  Plaintiff's Interrogatories.
18      A.    I see.
19      Q.    These are your answers?
20      A.    I guess, yes.
21      Q.    Did you prepare these answers with your
22  counsel?
23      A.    I did.
24      Q.    If you look at the last page --



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Pages 46..49

Page 46

1    THE WITNESS:  This is a different counsel, though,
2  correct?
3    MR. GORMAN:  Yes.
4  BY THE WITNESS:
5    A.   Look at the last page.
6    Q.   Yes.  That's your signature on the
7  verification page?
8    A.   Yes, it is.
9    Q.   You signed the verification attesting that
10  your responses are true and accurate to the best of your
11  knowledge?
12    A.   Yes.
13    Q.   Going back to the first page of Exhibit 4, in
14  your current position, do you make any determinations as
15  to the type of care that patients will receive?
16    A.   Be more specific, please.
17    Q.   Meaning elective surgeries specifically?
18    A.   No.
19    Q.   You had a general awareness that nasal
20  fractures can be a painful injury; is that fair?
21    A.   Yes.
22    Q.   And if it wasn't treated, that the pain could
23  continue?
24    MR. GORMAN:  Objection, form, foundation, calls for

Page 47

1  speculation.
2  BY THE WITNESS:
3    A.   I'm sorry.  Just because too you treat a fracture,
4  doesn't mean you're going to have less pain.  That's not
5  necessarily -- especially initially.  When you have
6  surgery, you have more inflammation, more pain.  And the
7  natural course of fractures is the pain goes away in
8  time.
9    Q.   If a fracture isn't treated right away, that
10  could cause more serious problems; is that accurate?
11    A.   No, that's not necessarily accurate;
12  otherwise, we would have taken him straight to surgery,
13  you know, the surgeon would have decided that
14  immediately.  He felt this could wait.
15    Q.   As he indicated, within a month after the
16  incident, it was determined he needed the surgery,
17  right?
18    A.   Yes.
19    Q.   You knew that when you saw the patient in
20  December?
21    A.   Yes.
22    Q.   So let's look at page 2 under Interrogatory
23  No. 4.  This asks why plaintiff wasn't able to receive a
24  surgery for his nasal fractures and the answer is on the

Page 48

1  next page.  In your answer you indicate you are not a
2  surgeon or ENT, you don't schedule any appointments, nor
3  are you involved in any part of the decisionmaking
4  process regarding surgeries.  Based on what you
5  testified to, you indicated you could speak with the
6  scheduler, right?
7    A.   Right.  So my duty is to make sure he doesn't
8  fall off somebody's radar off the schedule.  I don't
9  determine when he gets surgery.
10    Q.   Part of your duties really to making sure he
11  doesn't fall off the schedule, what steps do you take?
12    A.   Not the schedule of the surgical schedule.
13  Make sure he still has ENT follow-up.  If they gave him
14  a surgical date and he missed it, did they follow-up.
15  Other than that, I can't determine when he's going to
16  get surgery, nor should I.
17    Q.   What do you do to keep him on track, make sure
18  he meets his ENT appointments?
19    A.   I just make sure he has an ENT appointment.  I
20  call the scheduler, okay, he missed this date, they
21  bumped him for someone else, for instance -- we don't
22  always know -- please call him back and see can we get
23  him back in the schedule to be seen.
24    Q.   Would the scheduler ever tell you why he

Page 49

1  missed an appointment?
2    A.   Sometimes.  If she knows.  Sometimes the OR
3  team calls the day of surgery and says don't send him,
4  we have too many emergencies from the night before, we
5  have a big trauma case or several and they -- the OR
6  time is no longer there for him.
7    Q.   Do you recall any conversations you had with
8  the scheduler regarding the plaintiff?
9    A.   I don't recall this patient.
10    Q.   So your answer is you don't have any knowledge
11  as to why he did not receive the surgery?
12    A.   No, I don't.
13    Q.   If we turn to the next page, actually, the
14  bottom of page 3, Interrogatory No. 6 asks you to
15  describe your medical treatment you provided to
16  plaintiff and your answer is on page 4.  You indicate
17  that you notified the scheduling department to follow up
18  with Stroger regarding plaintiff's nasal surgery.
19    Do you see that?
20    A.   This is the answer to 6, right?
21    Q.   Answer to 6 there's --
22    A.   Notify the schedule -- Yes.
23    Q.   How do you know that you did that, is it based
24  on your practice?



Page 50

1   A.   Yes.
2   Q.   Would there be any document to show that you
3   did that?
4   A.   Not necessarily.
5   Q.   You also indicate as she noted that he did not
6   have a date scheduled, that was from your note as we
7   looked at?
8   A.   Or I might have looked in his chart.  There's
9   a scheduling part of his chart.
10  Q.   You indicate that you maintained prescriptions
11  for KEPPRA, which is for seizures, and Tylenol, in
12  parenthesis, nasal injury.  Is that for pain for his
13  nasal injury?
14  A.   Yes.
15  Q.   There's also another pain medicine listed,
16  ibuprofen?
17  A.   Yes.
18  Q.   Later on.  Do you know why that's not in the
19  record we looked at?
20  A.   He probably wasn't on it at the moment.  When
21  I saw him, I added it on.
22  Q.   I see.  Why did you prescribe ibuprofen in
23  addition to Tylenol?
24  A.   Just to decrease the inflammation.

Page 51

1   Q.   You say you prescribed pain medicine, meaning
2   the Tylenol and ibuprofen, right?
3   A.   Yes.
4   Q.   As well as nasal spray for his nasal fracture?
5   A.   Yes.
6   Q.   Why did you prescribe nasal spray for his
7   fracture?
8   A.   I believe it was just on -- keeping up with
9   the medicine they had given to him.
10  Q.   What about his -- Excuse me.
11       What about his fracture required nasal spray?
12  A.   I'm not exactly sure.  I'm not an ENT
13  specialist.  I was just renewing the medicine he was on.
14  Also, if he's got a dry nose, it's not going to help --
15  It's not really going to help his injury but maybe help
16  him breathe better.
17  Q.   Would that tend to show that the breathing
18  was -- breathing issue was due to his nasal fracture?
19  A.   I'm sure he couldn't breathe through his nose.
20  That doesn't make it a breathing problem because we can
21  always breathe through our mouths.  It's not
22  comfortable.  I agree it's not comfortable, but it's not
23  an emergency.
24  Q.   Would it be accurate to say you wouldn't have

Page 52

1   prescribed more pain medicine if he wasn't in pain?
2   A.   Yes, it would be -- If I felt the pain was
3   sufficient, we would have added opioids, I'm sure.
4   Q.   You indicate plaintiff was given a two-week
5   follow-up appointment and went to Stroger January 12,
6   2016?
7   A.   So she obviously got my call.
8   Q.   Did you ever follow up to see what happened at
9   the appointment at Stroger?
10  A.   No.
11  Q.   Now, in Interrogatory No. 7 this asks about
12  policies and customs for referrals for surgery
13  generally.  The answer is on the page, page 5.  In your
14  answer in the last sentence you say, In this case
15  Dr. Richardson is the individual responsible for
16  alerting schedule and to follow up with Stroger
17  regarding plaintiff's nasal surgery.  Is that accurate?
18  A.   Yes.
19  Q.   Can you explain why you're responsible for
20  that?
21  A.   I guess there's a chance that when a patient
22  misses a surgery for whatever reason, that by human
23  error he falls off their radar, right, off their
24  tracking system, so it's my responsibility to make sure

Page 53

1   they know he's waiting for surgery.
2   Q.   That's a duty you have as --
3   A.   As his primary care physician.
4   Q.   Any primary care physicians for plaintiff
5   would have that responsibility?
6   A.   Absolutely.
7   Q.   Including Dr. Paul?
8   A.   I don't know if Dr. Paul was -- I think she
9   saw him in that capacity, yes.
10  Q.   We looked at that note before?
11  A.   Yes.
12  Q.   As a primary care physicians, if, as you say,
13  plaintiff fell off the schedule, you would be
14  responsible for following up on that?
15  A.   Yes.
16  Q.   Specifically following up with Stroger
17  regarding the nasal surgery?
18  A.   No.  Our only duty is to make sure the
19  scheduler knows he needs an appointment.
20  Q.   Your duty to alert scheduling he needs an
21  appointment?
22  A.   Make sure there's no human error as to why
23  he's not seeing the specialist.
24  Q.   You would alert scheduling if you noticed that

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Page 54

1  the surgery fell off the calendar?
2      A.   Yes.  None of the primary care physicians can
3  order a surgery.
4      Q.   Right.  You can review the schedule to see
5  whether it is scheduled?
6      A.   Yes.
7      Q.   If you see it's not scheduled, then you can
8  notify scheduling?
9      A.   Yes.
10      Q.   Did you ever review the schedule to see when
11  the plaintiff was scheduled for surgery?
12      A.   Yes, in his chart.  Is that what you mean?
13  I don't have privy to the surgical schedule.
14      Q.   What I mean is any point after November 30th,
15  did you ever review the schedule to see if he was
16  scheduled for surgery?
17      A.   I saw him on December 30.
18      Q.   Excuse me.  December 30.  After December 30 --
19      A.   No.
20      Q.   -- did you ever look at the schedule?
21      A.   No, I did not.
22      Q.   You didn't see whether he was going to have
23  the surgery or not?
24      A.   No.

Page 55

1      Q.   Interrogatory No. 9 asks have you ever been
2  named as defendant in your employment?
3      A.   Objection, it's a matter of public record.
4      Q.   Right.  And I'm asking you in the deposition.
5      MR. GORMAN:  Objection, it's a matter of public
6  record.
7           That being said --
8  BY MR. KSIAZEK:
9      Q.   You didn't respond to the question, so I'm
10  asking you now.
11      MR. GORMAN:  That being said, you can answer.
12  BY THE WITNESS:
13      A.   Yes, I have.
14      Q.   Do you know how many times you have been named
15  as a defendant?
16      A.   I don't know how many times.
17      Q.   There have been multiple?
18      A.   Yes.
19      Q.   I understand you get sued a lot sometimes,
20  especially working for the county.
21      MR. KSIAZEK:  Let me take a quick break and we'll
22  wrap up.
23           (A short break was had.)
24      MR. KSIAZEK:  Back on the record.

Page 56

1  BY MR. KSIAZEK:
2      Q.   During your visit on December 30th, 2015, did
3  you ever review the CT scan results for Mr. Turner?
4      A.   I don't recall.
5      Q.   Are there any other conversations you had with
6  Mr. Turner that you can recall as, we sit here today?
7      A.   I don't recall Mr. Turner at all.
8      MR. KSIAZEK:  That's all I have.
9      MR. GORMAN:  Nothing from me.
10      MR. GORMAN:  Do you want to reserve or waive
11  signature?
12      MR. GORMAN:  We'll reserve.
13           (Witness excused.)
14
15
16
17
18
19
20
21
22
23
24

Page 57

1           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
   DARRYL TURNER,                      )
4                                      )
               Plaintiff,              )
5                                      )   No. 2017 CV 2434
               vs.                     )
6                                      )
   DR. REENA D. PAUL, DR. STAMATIA     )
7  Z. RICHARDSON, GINA J. CHUNG,       )
   PA-C, DR. ELIZABETH FELDMAN, DR.    )
8  CONNIE MENNELLA, DR. KENYA KEY,      )
   DR. DAVID KELNER, NNEKA JONES       )
9  TAPIA, SANDRA NAVARRO, and COOK     )
   COUNTY,                             )
10                                     )
               Defendants.            )
11
12      I, STAMATIA RICHARDSON, M.D., state that I
13  have read the foregoing transcript of the testimony
14  given by me at my deposition on the 12th day of
15  December, A.D., 2017, and that said transcript
16  constitutes a true and correct record of the testimony
17  given by me at said deposition except as I have so
18  indicated on the errata sheets provided herein.
19
20      _____
              STAMATIA RICHARDSON, M.D.
21
22  SUBSCRIBED AND SWORN to
   before me this _____ day
23  of _____, 2018.
24  _____
         NOTARY PUBLIC

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Pages 58..60

Page 58

```
1   UNITED STATES OF AMERICA        )
    NORTHERN DISTRICT OF ILLINOIS    )
2   EASTERN DIVISION                 )   SS.
    STATE OF ILLINOIS                )
3   COUNTY OF COOK                   )
4        I, Kristi Landolina, Certified Shorthand
5   Reporter, Registered Professional Reporter, and Notary
6   Public, do hereby certify that STAMATIA RICHARDSON, M.D.
7   was first duly sworn by me to testify to the whole truth
8   and that the above deposition was reported
9   stenographically by me and reduced to typewriting under
10  my personal direction.
11       I further certify that the said deposition was
12  taken at the time and place specified and that the
13  taking of said deposition commenced on the 12th day of
14  December, A.D., 2017, at 3:00 p.m.
15       I further certify that I am not a relative or
16  employee or attorney or counsel of any of the parties,
17  nor a relative or employee of such attorney or counsel,
18  nor financially interested directly or indirectly in
19  this action.
20
21
22
23
24
```

Page 60

```
1   Errata Sheet
2
3   NAME OF CASE: Turner vs Dr. Paul
4   DATE OF DEPOSITION: 12/12/2017
5   NAME OF WITNESS: Stamatia Richardson, M.D.
6   Reason Codes:
7        1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
                    _____
(Signature)
```

Page 59

```
1        In witness whereof, I have hereunto set my
2   hand and affixed my seal of office at Chicago, Illinois,
3   this 1st day of March, A.D., 2018.
4
5
6
7
8
9
10  KRISTI LANDOLINA, CSR, RPR
    180 North LaSalle Street
11  Suite 2800
    Chicago, Illinois 60601
12  Phone:  (312) 236-6936
13
    CSR No.  084-004611
14
15
16
17
18
19
20
21
22
23
24
```


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: 0recent..center

**0**

**0recent** 31:18

**1**

**1** 21:22 22:12 31:22 42:12
**11/20** 26:5
**12** 13:10 52:5
**12/2** 24:16,18 39:21
**12/30/2015** 14:21 22:14
**12:07** 22:22
**15** 13:10,16
**18** 13:16
**19** 39:6,11 40:5
**1986** 7:7,9,15
**1990** 7:9
**1993** 8:12
**19th** 40:24

**2**

**2** 47:22
**20** 40:15,20,21 41:5
**2008** 9:5,9
**2015** 10:15 24:5 31:24 38:7,17 39:6,11 40:5 43:22 56:2
**2016** 9:7,20 10:14 52:6
**20th** 41:4 42:1
**24** 35:2
**25** 31:24
**2800** 8:1
**2nd** 41:22

**3**

**3** 49:14

**30** 38:7,17 54:17,18
**30th** 33:18 39:13 40:10 41:6 43:22 54:14 56:2

**4**

**4** 45:8,12 46:13 47:23 49:16
**416** 39:3
**419** 22:12,14 23:1 40:2 42:12
**420** 23:16 36:23
**421** 28:19
**422** 22:22 29:9,18
**48-hour** 35:2

**5**

**5** 52:13

**6**

**6** 49:14,20,21

**7**

**7** 52:11

**9**

**9** 55:1
**90** 9:4
**93** 8:22
**96** 9:4

**A**

**ability** 18:23 32:23 33:4 35:17
**abnormal** 28:23
**Absolutely** 53:6
**accident** 36:15
**accurate** 46:10 47:10, 11 51:24 52:17

**actions** 18:5 33:17
**added** 50:21 52:3
**addiction** 10:1,3,12
**addition** 9:16 50:23
**address** 8:2
**administrative** 9:21, 22 43:17
**afternoon** 4:8
**agree** 51:22
**ahead** 23:9
**albuterol** 27:15
**alert** 53:20,24
**alerting** 52:16
**allegations** 4:20
**ambulatory** 15:8
**Amitriptyline** 28:1
**anesthesia** 40:6,12
**answering** 5:19
**answers** 45:16,19,21
**anymore** 8:2
**apparently** 11:20
**appearance** 29:18
**appears** 39:15
**appendicitis** 18:10
**appointment** 17:7 18:4,6,14 20:20 25:4, 10 34:7,9 48:19 49:1 52:5,9 53:19,21
**appointments** 15:12 19:2 20:17 32:24 33:5, 13,18 48:2,18
**area** 22:6 30:5,17,20 44:19
**areas** 10:16 30:7
**arm** 25:8
**asks** 47:23 49:14 52:11 55:1
**assess** 13:21
**assessment** 31:13
**assign** 42:5

**assistants** 13:12,14
**assume** 5:5
**assuming** 39:22
**assumption** 43:8
**asthma** 23:22 25:18 27:18 28:3,12 31:16 37:4
**attending** 8:15 9:4,6, 10 11:4,11,17 19:16
**attention** 18:17,21
**attesting** 46:9
**August** 8:12
**awaiting** 24:16 25:1,4 26:21 32:7 34:8 41:17
**aware** 24:24 26:10,17
**awareness** 46:19

**B**

**back** 14:14 15:2 18:14 36:22 42:12 46:13 48:22,23 55:24
**background** 7:3 12:13
**bad** 36:5
**based** 24:23 25:24 26:17 37:18 38:16 39:15 48:4 49:23
**basic** 23:1
**basically** 11:5 22:9
**Bates** 22:12,22 23:16 28:19 29:9 39:2
**Beclomethasone** 28:3
**benefit** 5:8
**big** 49:5
**board** 9:24 10:1,11,16 20:22
**body** 20:3
**bones** 30:15,19,21
**bottom** 22:14 40:4 49:14

**break** 5:20,23 55:21, 23
**breath** 25:23 26:2 27:20,23 29:21 37:1 38:4
**breathe** 35:17 37:3,24 51:16,19,21
**breathing** 35:23 36:17 37:4,6,15,22 38:1,4,6 51:17,18,20
**briefly** 11:3
**broken** 32:4
**bronchi** 31:2,4 36:20 37:19 38:3
**brought** 4:21
**bucket** 15:10
**bumped** 48:21
**bumping** 43:10

**C**

**C/o** 25:19
**calendar** 54:1
**call** 15:3 17:9 18:12, 14,19,20,21 33:21 34:7 48:20,22 52:7
**called** 4:4 7:20 9:15 15:3 17:14,17 21:2 42:5,6 44:14
**calls** 14:4 16:14,15 17:1,20 27:2 33:7 35:10 36:1 46:24 49:3
**capacity** 53:9
**cardiologist** 20:2
**care** 10:7,9 11:7 12:20 21:13 46:15 53:3,4,12 54:2
**cartilage** 30:22
**case** 4:22 16:18 21:24 24:12 33:24 34:19,22 36:9 38:5 45:13 49:5 52:14
**cases** 43:8,10
**center** 19:14



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: Cermak..explain

**Cermak** 8:19,20,22 9:15 11:4 13:8,15 15:9,24 19:8 21:1,3,7, 16 24:22,23,24 25:15 32:13,18

**certification** 10:1,11

**certified** 9:24 10:16 20:22

**chair** 9:19

**chairman** 9:7

**chairs** 13:2

**chance** 52:21

**change** 9:10,20 35:20

**changed** 9:1 14:13,18

**charge** 9:14

**chart** 6:12,13 20:21 31:21 50:8,9 54:12

**check** 16:19

**Chicago** 7:13 8:3,4

**choose** 12:4 42:10

**chronic** 10:8 20:17, 18,19 23:23 24:3,15 31:10,17 41:17,21

**chung** 45:8

**Chung's** 21:22 22:12

**claims** 37:2

**clear** 21:17 26:8

**clearance** 40:6 41:3, 12,24

**clinic** 11:12,14,15,18 12:2,6,8,16,17 13:21 14:1 15:24 17:6 19:18 20:4 21:4,6,14,15 24:21,24 25:3,5,13,15 26:7 32:11,17 33:14 34:9 38:20 39:18 40:12,13 41:6,7,9,10, 11

**clinics** 12:18,19 15:8 21:1 25:7 32:21 33:19 34:17

**cold** 31:9

**colleagues** 10:8

**comfortable** 51:22

**comma** 40:7

**common** 33:20 34:6

**communicating** 17:8

**complaining** 25:20, 21 29:21 37:1

**computer** 14:11,17 15:4 23:9

**condition** 31:6

**confused** 41:19

**consult** 18:22

**contact** 16:7

**contacted** 18:2

**continuation** 29:10

**continue** 46:23

**continued** 11:9 35:23

**conversations** 44:1 49:7 56:5

**Cook** 15:7 42:24 43:4, 14,19

**COPD** 31:16 37:5,16

**correct** 23:3,6,14,17, 23 24:8 26:19 27:16, 23 28:5 30:2 31:14 32:8 35:24 38:8 39:18, 23 42:14 45:13 46:2

**Correctional** 9:8

**cough** 25:19

**counsel** 4:19 6:22 7:1 45:22 46:1

**county** 8:9,10,11,14, 18 15:7 19:13 42:24 43:4,15,19 55:20

**couple** 28:5

**court** 5:8,17

**cover** 12:6 22:5,7

**covered** 16:1

**CQI** 11:6,8

**creams** 28:5

**CT** 56:3

**current** 12:22,23 46:14

**customs** 52:12

**D**

**date** 22:16 26:5,21 27:1 29:2 31:23 40:14 41:5,8,10 42:1,4,10,11 48:14,20 50:6

**day** 11:22 22:8 33:16 41:2,4 49:3

**days** 16:20

**dealing** 24:5

**December** 33:18 38:7,17 39:13 40:10, 21 41:22 43:22 47:20 54:17,18 56:2

**decided** 47:13

**decision** 43:11

**decisionmaking** 48:3

**decrease** 35:16 50:24

**defendant** 45:16 55:2,15

**deformities** 29:16

**degree** 7:12

**department** 9:8 49:17

**depend** 16:18 18:7 19:12

**depends** 11:19 13:6 40:18

**deposition** 4:13 6:7 21:22 22:13 45:8 55:4

**describe** 9:22 11:3 44:5 49:15

**desk** 17:15

**details** 19:9

**detainee** 13:20,24

**determination** 37:7 38:17

**determinations** 46:14

**determine** 31:18 38:13 48:9,15

**determined** 47:16

**determines** 21:13

**detox** 10:2

**developed** 29:12,15

**deviated** 35:18 44:5

**diagnosis** 31:16

**difference** 35:3

**difficult** 5:16

**difficulty** 35:23 37:22 38:3

**direct** 4:6 43:2

**director** 11:6

**discussed** 4:18 31:17 43:23

**disease** 10:8 20:17, 18,19 31:11 37:20

**disorder** 31:17

**distress** 29:18,22 36:12 44:23

**Diversey** 8:1

**division** 22:5

**divisional** 9:7,19 13:2

**document** 17:18 45:15 50:2

**documentation** 18:1

**documented** 45:3

**documents** 6:9

**Drive** 8:1

**dry** 51:14

**due** 31:6 35:23 51:18

**duly** 4:4

**duties** 9:10,16,20 11:3 13:21 48:10

**duty** 48:7 53:2,18,20

**E**

**e-mail** 33:21

**ear** 29:5 30:1

**education** 7:4

**effect** 15:14

**elective** 17:5 19:12 42:7 43:9,12 46:17

**electronic** 17:10 22:18,21

**electronically** 33:21

**else's** 37:8

**emergencies** 49:4

**emergency** 18:24 19:14 51:23

**emergent** 16:19 34:20,23 42:8 43:10, 12

**emollients** 28:7

**employed** 8:20

**employment** 55:2

**end** 30:21 40:2

**ensure** 16:5 33:4,18

**ENT** 20:22 48:2,13,18, 19 51:12

**entail** 44:21

**entails** 44:17

**entire** 6:19,20 20:15

**error** 52:23 53:22

**Evaluating** 10:9

**evaluation** 26:1

**Eve** 11:20 22:6

**events** 16:9

**eventually** 35:6,7

**exam** 29:2,4 30:4 36:19 37:14 38:19

**examination** 4:6 38:16

**examined** 4:5

**Excuse** 32:17 51:10 54:18

**excused** 56:13

**Exhibit** 21:22 22:12 31:22 42:12 45:8 46:13

**explain** 4:17 18:9



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: explanation..main

21:6 44:17 52:19

**explanation** 43:6

**eyes** 30:6,11

**F**

**fact** 35:20

**fair** 5:6,7 29:17 42:2 46:20

**fall** 48:8,11

**falls** 52:23

**familiar** 44:20

**family** 7:18,22 10:17

**Fantus** 24:17 25:1,3,7 41:19,23

**feel** 34:22

**feeling** 38:5

**fell** 53:13 54:1

**felt** 18:16,24 47:14 52:2

**figure** 15:22

**findings** 38:5

**fine** 8:3

**follow** 5:9 16:23 17:6 18:3,15 38:10 49:17 52:8,16

**follow-up** 20:9 23:3,5 34:21 40:6 43:22 48:13,14 52:5

**form** 14:4 16:14,24 17:19 27:2 33:6 35:10 36:1 46:24

**foundation** 14:4 16:14,24 17:19 27:2 33:6 35:10 36:1 46:24

**fracture** 24:17 25:1,2, 5,10,13,24 26:2,4 27:23 31:18,19 32:6,8, 17 33:14 34:9 37:2,7, 20 41:12,18,19,20,24 42:2 47:3,9 51:4,7,11, 18

**fractures** 26:18 36:5 46:20 47:7,24

**front** 18:8 21:21

**function** 13:17

**functions** 9:22

**G**

**gave** 15:11 48:13

**general** 11:14,18 12:16 13:21 14:1 18:1 29:10 46:19

**generalities** 36:10

**generally** 52:13

**give** 5:10 10:6 19:10

**good** 4:8 35:16

**GORMAN** 14:4 16:14, 24 17:19 27:2 33:6 35:10 36:1 46:3,24 55:5,11 56:9,12

**grade** 9:6,9

**graduate** 7:6,8,14

**graduated** 7:9,16

**ground** 4:17

**guess** 13:10 21:17 41:18 45:20 52:21

**H**

**half** 7:2

**handed** 45:11

**happen** 25:12

**happened** 18:15 52:8

**happening** 18:8 42:8

**hard** 37:3 38:6

**head** 5:11 29:5 30:1

**Health** 8:19 15:7

**hear** 5:2 11:21

**heard** 5:5

**HENT** 30:1

**Hernandez** 16:3,6,8, 12 17:9,17 18:3 34:13, 16

**higher** 9:9

**highest** 7:4

**histories** 27:11

**history** 20:15 24:7,14 27:12 36:22,24 37:9

**hold** 15:10

**hope** 45:5

**hospital** 7:21 15:2,7 18:18,19,24 19:13

**hour** 7:2

**HPI** 39:24

**human** 52:22 53:22

**hurt** 38:2

**hypothetical** 14:5 16:15 17:1,20 27:3 33:7 35:11 36:2

**I**

**ibuprofen** 50:16,22 51:2

**idea** 25:17

**Illinois** 10:23

**illness** 24:8,15 36:23

**immediately** 39:2 47:14

**impact** 36:8

**impacted** 35:9

**impression** 31:13 40:4,5

**improper** 14:5 17:1 27:3 33:7 35:11 36:2

**incident** 31:24 36:18 47:16

**Including** 53:7

**incomplete** 17:20

**independent** 22:1

**indication** 26:17

**indicative** 29:22

**individual** 52:15

**inflammation** 47:6 50:24

**information** 23:2

**infraorbital** 30:9

**initially** 35:21 47:5

**injury** 31:7 35:24 46:20 50:12,13 51:15

**inpatient** 15:9 27:15

**instance** 48:21

**internally** 25:16

**interrogatories** 45:13,17

**Interrogatory** 47:22 49:14 52:11 55:1

**intervention** 35:3

**involved** 29:4 48:3

**involvement** 4:20 19:3

**involving** 4:21

**Iris** 15:3,14,15

**issue** 51:18

**J**

**jail** 10:3 42:24 43:4,19

**January** 52:5

**Joseph's** 7:20,21

**judge** 43:15

**K**

**keeping** 51:8

**KEPPRA** 50:11

**kind** 15:10

**knee** 23:23 24:16 31:17 41:15,17,20,21

**knew** 47:19

**knowledge** 4:23 14:24 19:10 20:6 23:9, 20 26:24 42:23 43:2 46:11 49:10

**KSAIZEK** 55:24 56:8, 10

**KSIAZEK** 4:7 45:10 55:8,21 56:1

**L**

**lab** 40:19

**labs** 26:7,12

**Lake** 8:1

**Laura** 16:3

**lawsuit** 4:21

**lawyer** 6:8

**layman's** 44:10

**learn** 42:19

**leave** 17:9 33:21

**left** 42:24

**level** 7:4 9:6

**levels** 35:9

**Levetiracetam** 28:9

**license** 10:18

**licensed** 10:20

**lines** 31:12

**list** 23:19

**listed** 22:21 23:22 24:2 28:5 50:15

**lists** 33:2 27:15

**located** 7:24

**location** 8:18

**long** 7:1 8:5

**long-term** 35:18

**longer** 49:6

**looked** 50:7,8,19 53:10

**lot** 11:20 42:4 55:19

**Loyola** 7:10,13

**lungs** 36:20

**M**

**M.D.** 4:3

**made** 25:14 35:3

**main** 15:24


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: maintained..prepared

**maintained** 50:10

**make** 15:19 16:8,11, 20 18:5,6,17 35:20 36:6 38:17 39:14 46:14 48:7,13,17,19 51:20 52:24 53:18,22

**makes** 5:16 43:11

**making** 48:10

**marked** 21:21 45:9,11

**matter** 35:20 55:3,5

**meaning** 11:8 17:9 24:4,21 30:7,12 44:7 46:17 51:1

**means** 5:10 32:10 44:10

**measures** 10:8

**medic** 28:17

**medical** 7:6,16 14:20 15:5,6 20:12,15 21:23 24:19 39:1,17 43:15 44:7 49:15

**medications** 27:12, 15,16

**medicine** 7:10,18 9:8 10:1,12 28:1,2,10,12 50:15 51:1,9,13 52:1

**medicines** 28:13

**meet** 7:1

**meets** 48:18

**memory** 4:18 14:19 22:4 32:1 45:2

**mentioned** 10:11 40:13 44:3

**message** 15:21 16:21 17:10

**met** 6:22

**methadone** 9:14 11:5,6,10 12:2,6,8,17

**method** 17:8,12

**middle** 31:21 39:5 44:11

**mild** 29:18,22

**missed** 40:15 48:14, 20 49:1

**misses** 52:22

**moment** 17:15 50:20

**month** 18:13 47:15

**months** 32:4 36:14,17

**mouth** 37:3,23,24

**mouths** 51:21

**moved** 44:12

**multiple** 11:22 15:8 55:17

---

**N**

**named** 42:22 55:2,14

**nasal** 25:24 26:2,4,18 27:23 30:14,17,19,21 31:6,18,19 32:6 37:2,6 41:12,13,24 46:19 47:24 49:18 50:12,13 51:4,6,11,18 52:17 53:17

**natural** 47:7

**necessarily** 35:19 36:6 47:5,11 50:4

**needed** 12:7 14:1 15:16 18:6,16,21 19:7 26:18 32:10 35:4 38:18 40:21 47:16

**network** 7:22

**night** 49:4

**nod** 5:11

**nonverbal** 5:12

**noon** 22:23

**Northwestern** 7:21

**nose** 24:2 29:5 30:2,6, 20,23 32:4 35:5,8,17 36:20,21 37:21 38:1 41:20 42:14 44:11 51:14,19

**note** 17:10,24 18:1 31:1 33:22 34:10,12 39:24 41:1 42:13 50:6 53:10

**noted** 30:9 34:22 44:23 50:5

**notes** 20:19

**noticed** 53:24

**notified** 49:17

**notify** 49:22 54:8

**November** 39:6,11 40:5,15,20,24 41:5 42:1 54:14

**number** 13:7

**nurse** 21:12 28:16

**nurses** 13:18

---

**O**

**oath** 6:1

**Objection** 14:4 16:14, 24 17:19 27:2 33:6 35:10 36:1 46:24 55:3, 5

**observing** 38:20

**obstruction** 44:6

**obstructive** 31:10

**obtain** 26:24

**obvious** 29:16

**occur** 35:22

**occurred** 33:24

**October** 10:15 24:5 31:24

**Oftentimes** 19:14

**open** 37:3,23

**opiate** 9:15

**opinion** 19:19 38:22

**opioids** 52:3

**order** 14:9,10,16 15:15 54:3

**orders** 43:14

**organized** 15:11

**ORS** 42:8

**ortho** 21:4,6 24:16,17, 19,21,23 25:1,2,4,10, 13,15 32:7,17 34:9 39:20 41:6,10,11,13, 15,18,19,20,22

**orthopedic** 21:13

**OTP** 9:15

**outcome** 35:16 36:5

**outpatient** 25:8 39:17

---

**P**

**p.m.** 22:22

**PA** 21:11

**pages** 22:13

**pain** 23:23 24:16 28:13 29:23 31:17 35:9,16,19 41:17,22 44:24 45:4 46:22 47:4, 6,7 50:12,15 51:1 52:1,2

**painful** 46:20

**Palpate** 30:7

**palpated** 30:5

**parenthesis** 50:12

**part** 7:21 25:17 29:4 30:14 44:11 48:3,10 50:9

**parts** 20:3

**patient** 13:20,22,24 16:5,9 17:18 18:5 19:11 20:9,16 24:15 25:18,21 26:4 32:7 36:24 37:1,9 47:19 49:9 52:21

**patients** 11:12 15:9 19:4 37:13 46:15

**Paul** 39:7,9,10,16 40:4,24 42:12 53:7,8

**Paul's** 40:3

**pending** 5:22

**people** 5:17 15:11 16:2

**perform** 30:4

**performed** 9:23

**person** 15:23 16:1 18:17 19:24 44:8

**personnel** 43:10

**phone** 17:15

**physical** 29:2,4 30:4 37:13,14 38:5

**physician** 7:5 8:15 9:10,17 11:4,11,17 19:16 53:3

**physician's** 13:11,14

**physicians** 12:21,24 13:3,5,8 53:4,12 54:2

**piecemeal** 39:22

**place** 14:22 43:7

**places** 21:10

**plaintiff** 34:17 35:4,7, 22 36:9,11 47:23 49:8, 16 52:4 53:4,13 54:11

**plaintiff's** 45:17 49:18 52:17

**plan** 31:13 40:4,5,6

**plans** 42:13

**plastic** 21:14,15,18,19 40:7 42:14

**plastics** 21:2,3,17 32:7,11 33:14

**pleasant** 38:2

**podiatrist** 20:3

**point** 15:13 40:22 41:8 54:14

**policies** 10:2 52:12

**position** 8:13 12:22, 23 19:16 46:14

**positive** 30:9,14 34:3

**post** 36:14,18

**practice** 7:22 10:17, 20 33:20 34:6,10,19 45:6 49:24

**practitioner** 21:12

**preferred** 17:12

**preop** 26:5,6,10 40:6, 12,14,15,16,21 41:7,9, 12,24

**prepare** 6:6 24:10 26:10 45:21

**prepared** 24:12



Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: prepopulated..started

**prepopulated** 23:20

**prescribe** 50:22 51:6

**prescribed** 51:1 52:1

**prescriptions** 50:10

**present** 6:23 8:23
24:7,15 28:20 36:22

**presents** 24:15

**preventing** 6:3

**previous** 27:13 29:11

**primary** 11:7 53:3,4,
12 54:2

**prior** 14:24 20:12
24:18 39:2

**privy** 54:13

**problem** 5:21 20:20
23:19 24:3 51:20

**problems** 23:20,22
37:4 47:10

**process** 48:4

**program** 9:14,15
11:5,10

**project** 11:6 13:6

**projects** 10:4

**provided** 49:15

**provider** 13:23

**public** 55:3,5

**pulmonary** 31:11

**put** 29:11

**Q**

**quality** 10:7 11:9

**quality-type** 10:4

**question** 5:2,3,4,15,
19,22,23 14:7 21:16
35:13 55:9

**questions** 4:19,22

**quick** 55:21

**R**

**radar** 48:8 52:23

**random** 11:23,24

**rarely** 22:5

**reach** 34:16

**read** 40:9 41:16 42:21

**reallocate** 19:15

**reask** 5:3

**reason** 5:20 24:1
35:15 52:22

**recall** 49:7,9 56:4,6,7

**receive** 25:10 26:15
35:8 43:3,18 46:15
47:23 49:11

**received** 9:9 24:18
32:4 42:19

**receiving** 12:20

**recent** 31:19 32:6
39:16

**recollection** 22:1

**record** 4:9 6:20 22:3,
11,13,18 24:19,20,23
31:23 39:1,6,11,12
40:3 42:21 44:9,24
45:4 50:19 55:3,6,24

**records** 6:15 14:20
15:5,6 20:13 21:23
39:15

**reduction** 44:21

**Reena** 39:7

**refer** 19:17,18,20

**referral** 14:1,9,10
15:15,17,19 25:14

**referrals** 14:22 15:10
52:12

**referred** 21:10 38:13

**referring** 39:24

**refresh** 4:18 22:4 32:1

**regular** 11:7,21

**regularly** 11:12

**related** 4:20 11:9
31:10 41:11

**relating** 43:15

**remember** 33:20
34:18

**remembered** 22:6

**renewing** 51:13

**repeat** 40:20

**rephrase** 5:4

**reporter** 5:8,17

**request** 16:12 23:12

**requested** 45:9

**required** 51:11

**reserve** 56:10,12

**residency** 7:17,18,23
8:5,7

**resources** 19:15

**respiratory** 31:1

**respond** 55:9

**responding** 5:15

**response** 10:24

**responses** 5:10,13
45:12 46:10

**responsibility** 52:24
53:5

**responsible** 52:15,19
53:14

**results** 56:3

**review** 6:9,11,15,18
20:12,15 54:4,10,15
56:3

**reviewed** 6:19 20:21
39:12

**reviewing** 22:3

**Richardson** 4:3,10,
12 45:12,16 52:15

**rough** 19:10

**rougher** 31:5

**roughly** 19:9

**rule** 5:21

**rules** 4:17 5:9

**run** 11:5

**S**

**scan** 56:3

**remembered** 22:6

**schedule** 11:22 16:12
19:22,23 20:2,4,7 27:7
32:23 33:1 48:2,8,11,
12,23 49:22 52:16
53:13 54:4,10,13,15,
20

**scheduled** 16:9 19:7,
12 23:2,8 32:7 33:13,
16 50:6 54:5,7,11,16

**scheduler** 15:3,21,23
25:17 33:22 48:6,20,
24 49:8 53:19

**scheduling** 18:4
19:2,4 34:7,17 49:17
50:9 53:20,24 54:8

**school** 7:6,10,16

**section** 23:17 24:7,
10,14 27:11 29:10,11
31:1,12 40:5

**sees** 15:20

**seizure** 23:22 31:17

**seizures** 28:2,10
50:11

**self-evident** 44:7

**send** 17:10 18:23
34:10 49:3

**senior** 9:4,5,10 11:4,
11,17

**sentence** 52:14

**separates** 44:12

**septorhinoplasty**
44:15

**septum** 44:5

**Services** 8:19

**shake** 5:11

**Shore** 8:1

**short** 55:23

**shortness** 25:23 26:1
27:20,22 29:21 37:1
38:4

**show** 50:2 51:17

**side** 44:12,13

**sign** 30:12

**signature** 22:21 46:6

**56:11**

**signed** 22:18 39:14
46:9

**signs** 28:17,20,22

**simple** 20:19

**simply** 15:4 26:21

**sit** 28:22 56:6

**SOB** 25:22

**somebody's** 48:8

**sort** 34:11

**sound** 31:5

**Sounds** 30:5

**speak** 16:6 43:17 48:5

**speaking** 18:3 24:19
36:10

**specialist** 15:20 16:6
18:6 21:11,12 27:9
32:10 38:22 41:23
43:13 44:18 51:13
53:23

**specialists** 18:20
19:3,20,23 20:7

**specialty** 11:14
12:14,17,19 14:2
15:24 16:1 21:1 25:7
33:19 34:17 38:20

**specific** 14:12 26:14
30:20 46:16

**specifically** 23:12
46:17 53:16

**speculation** 14:5
16:15 17:1,20 27:3
33:7 35:11 36:2 47:1

**spell** 4:9

**spend** 12:1

**spray** 51:4,6,11

**St** 7:20,21

**staff** 43:17

**Stamatia** 4:3,10 45:16

**start** 8:16 21:24

**started** 8:11,13 10:2
24:5


JENSEN
Litigation Solutions

Turner vs Dr. Paul
Stamatia Richardson, M.D. - 12/12/2017

Index: starting..zafirlukast

**starting** 22:14 39:5

**starts** 22:12 29:10 30:22 39:2

**state** 4:8 31:23

**states** 10:21

**stay** 6:19

**steps** 14:2 15:19 16:11 48:11

**straight** 47:12

**Strike** 13:7

**Stritch** 7:10

**Stroger** 19:13 21:19, 20 25:8 32:16,20,21, 22 49:18 52:5,9,16 53:16

**studied** 9:24

**subjective** 23:17 38:4

**subsequent** 15:18

**sued** 55:19

**sufficient** 52:3

**supervise** 12:21,24 13:1,5,11

**supervision** 13:4

**supervisory** 13:17

**surgeon** 26:12 27:7 40:19 44:18 47:13 48:2

**surgeries** 19:4,7,22, 23 20:5,7 46:17 48:4

**surgery** 18:11 19:7, 12,17,19,21,24 20:4 21:14,15,18,19 26:5,8, 9,11,14,18,21 27:1,8 35:4,8,15,21,22 36:6,8 38:14,18,21 40:7,14 41:8,10 42:14,17,20 43:3,11,18 44:14,17 47:6,12,16,24 48:9,16 49:3,11,18 52:12,17, 22 53:1,17 54:1,3,11, 16,23

**surgical** 19:18 42:1,4, 11 48:12,14 54:13

**suspended** 10:18

**swelling** 37:21

**sworn** 4:1,5

**system** 14:11,17,22, 24 15:2,5,11,22 16:7 18:13 52:24

**systems** 15:1,7

---

**T**

**taking** 27:12

**talk** 14:14

**talked** 6:8 19:2 39:20

**talking** 5:17

**team** 49:3

**tend** 51:17

**tender** 30:11,12,14,17 36:14

**tenderness** 30:9

**terms** 35:16 44:10

**testified** 4:5 48:5

**testifying** 6:4

**thing** 42:2

**threw** 42:2

**throat** 29:5 30:2

**time** 4:15 7:22 9:20 12:1,6,7 13:9 14:12, 17,22 15:14,15,16,18 19:13 22:21 23:9,10 26:2 27:13 28:14 31:20 37:3 38:6,7,18, 23 42:9 43:9 47:8 49:6

**times** 9:2 42:4 55:14, 16

**title** 9:1,5

**titled** 23:17 24:7 27:11 29:10 45:16

**today** 6:1,4 28:23 56:6

**told** 12:5 37:10,11 45:4

**tomorrow** 18:11

**top** 23:17 29:9 30:23 40:3

**touch** 30:7

**track** 48:17

**tracking** 52:24

**transcript** 5:16

**trauma** 19:14 49:5

**treat** 13:22 47:3

**treated** 46:22 47:9

**treating** 13:23

**treatment** 9:15 14:2 38:10 43:15 44:2 49:15

**trouble** 36:17 37:6,15

**true** 46:10

**truthfully** 4:23 6:4

**turbinate** 44:6,20

**turn** 23:1,16 28:19 29:1 31:22 40:2 49:13

**Turner** 4:21 6:16 12:12 14:15,21 15:13 21:9 22:1,3,11,16 23:5,19 24:24 25:9,12 26:1,18,24 27:12,22 28:13,16 29:2 32:3 33:5,18 34:8 38:8,16 39:3,7,17 40:10,24 41:5 42:13,16,19,24 43:3,18,21 44:2,24 45:4 56:3,6,7

**Turner's** 6:13 21:23 24:1 28:17 29:5 39:16 43:15

**Turning** 29:17

**two-week** 52:4

**Tylenol** 50:11,23 51:2

**type** 14:1 15:4 23:2 35:2 44:14 46:15

**types** 23:8

---

**U**

**Uh-huh** 10:13 27:10 29:6,13 30:8

**undergraduate** 7:11

**underneath** 13:5

**understand** 5:2 6:1 14:6 16:16 17:2 27:4 33:8 35:12 55:19

**understanding** 19:6, 11 21:18 33:12 40:23

**understood** 5:5 17:21

**unit** 10:2

**University** 7:13

**unusual** 42:10

**urgency** 18:7

**urgent** 10:7 12:19 16:19,22

---

**V**

**vacation** 16:2

**verbal** 5:10 10:24

**verification** 46:7,9

**versus** 5:11 21:18

**viewing** 28:22

**visit** 6:16 20:10 22:1, 4,11 23:2,5 26:22 39:2,6,12,16,17,20 40:10,16 43:21 45:1,2 56:2

**visiting** 20:13

**visits** 23:8

**vital** 28:17,20,22

---

**W**

**wait** 5:14,18 17:6 18:12,13 47:14

**waiting** 34:7 41:22 53:1

**waive** 56:10

**walk** 9:3 14:2

**walk-in** 20:20

**wanted** 16:5 38:21

**week** 11:22 12:9 18:12 42:9

**wet** 31:5

**wheezes** 31:2 36:20 37:19

**wheezing** 25:21 38:3

**work** 8:7,18 10:3 11:7, 9,18 12:10,17,20 18:14 40:19

**worked** 8:8,19,22

**working** 8:16 13:6 55:20

**works** 21:12

**worse** 35:21

**wrap** 55:22

**write** 17:24 18:1 29:20

---

**X**

**X-RAYS** 26:8,12

---

**Y**

**year** 7:14 10:1 18:13

**Year's** 11:19 22:6

**years** 4:16 8:6

---

**Z**

**zafirlukast** 28:11


JENSEN
Litigation Solutions