# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARRYL TURNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17 C 2434 |
| ) | |
| DR. REENA D. PAUL, DR. STAMATIA ) | |
| Z. RICHARDSON, GINA J. CHUNG, ) | |
| DR. ELIZABETH FELDMAN, ) | |
| DR. CONNIE MENNELLA, DR. KENYA ) | |
| KEY, DR. DAVID KELNER, DR. NNEKA ) | |
| JONES TAPIA, SANDRA NAVARRO, ) | |
| and COOK COUNTY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Darryl Turner, a former inmate at the Cook County Jail, has sued a number of medical professionals and administrators at Cermak Health Services of Cook County and the Cook County Health and Hospitals System, alleging that they violated the Eighth and Fourteenth Amendments by failing to ensure that he promptly received surgery to treat a facial fracture. He has also sued Cook County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), alleging that its policies and customs unconstitutionally delayed his treatment. The defendants have moved for summary judgment.

## Background

On October 24, 2015, Turner suffered a broken nose in an altercation with

another inmate at the jail. He was taken to the urgent care clinic at Cermak Health Services, the jail's medical center, where he was evaluated by Dr. Reena Paul. Dr. Paul diagnosed Turner with nasal trauma and sent him to receive a CT scan at Stroger Hospital, which is operated by Cook County. The CT scan showed minimally displaced fractures in Turner's nasal bones and septum, a small septum hematoma, and an s-shaped configuration of the septum. Several days later, Turner saw an ear, nose, and throat (ENT) specialist at Stroger. The ENT recommended that Turner follow up at Stroger's plastic surgery clinic for a nasal fracture evaluation.

On November 9, 2015, while appearing in Cook County criminal court, Turner told the judge that his broken nose had not been attended to and that he had an appointment with a plastic surgeon scheduled for the following day. The judge issued an order requiring that Turner "be seen by a doctor as soon as possible for his broken nose and any additional injuries he suffered." Mennella Dep., dkt. no. 83–4, at 55:19–56:13.

The next day, Turner was transported to the plastic surgery clinic at Stroger, where he was evaluated by Dr. Stefan Szczerba, an assistant clinical professor of surgery. Dr. Szczerba found that Turner had a broken deviated septum, a turbinate obstruction, and a mild deformity of the nasal bones. He determined that Turner should undergo a septorhinoplasty and turbinate reduction—surgical procedures intended to improve nasal breathing. Dr. Szczerba later testified that these surgeries could not occur until the swelling from the initial trauma subsided. He further testified that he believed that he expected Turner would have the surgery between six months and one year after he first evaluated Turner.

2

Turner had a follow-up appointment with Dr. Paul at Cermak on November 19, 2015. She determined that Turner had missed his pre-operation clearance that was scheduled for that same day. The pre-operation clearance is administered at Stroger's anesthesiology clinic and is intended to ensure that the patient is medically cleared for surgery. Dr. Paul contacted the scheduling department at Stroger to ensure that Turner received the clearance. Turner was taken to Stroger for the pre-operation clearance the next day.

Turner appeared in criminal court again on December 14, 2015. He told the judge—apparently incorrectly—that his surgery had been scheduled for November 9th or 10th but had not occurred. He also told the judge that the jail had ignored the previous court order. Based on Turner's statements, the judge issued a second order requiring the jail to give Turner any required surgery as soon as possible.

On December 22, Turner's criminal defense attorney Mark Parts sent a letter to the executive director of the Cook County Department of Corrections, Dr. Nneka Jones Tapia, explaining that Turner had not yet received surgery despite the judge's order. Dr. Jones Tapia forwarded Parts' letter to two Cermak administrators: Dr. Elizabeth Feldman, the divisional chair for clinical operations, and Dr. Connie Mennella, chair of the department of correctional health.

On December 30, 2015, Turner had another follow-up appointment at Cermak, this time with Dr. Stamatia Richardson. Dr. Richardson noted that Turner did not have another appointment scheduled at the plastic surgery clinic and indicated that an appointment should be scheduled. He was given an appointment on a date about two weeks later.

3

At that appointment, which took place on January 12, 2016, Dr. Szczerba evaluated Turner again. He noted that Turner complained of extreme tenderness over his nasal bone and recommended that Turner return to the clinic in one to two weeks to evaluate the timing of his surgery. The next day, Turner had another appointment with Dr. Paul regarding an unrelated medical complaint. Dr. Paul noted that Turner had his surgery scheduled for the following week.

Turner returned to the plastic surgery clinic again on January 19, 2016. He was evaluated by Dr. Michael Gart, a medical resident. Dr. Gart scheduled him for surgery on January 21. That surgery did not take place, however. Dr. Gart and Dr. Szczerba testified that they did not recall why the surgery was canceled, although they stated that Turner's surgery was "elective" and that it was commonplace for elective surgeries that were not emergencies to be rescheduled to make time for urgent surgeries.

On February 2, 2016, Sandra Navarro, the deputy director of risk management at the Cook County Health and Hospitals system, received a call from attorney Parts, who informed Navarro that Turner had not yet undergone surgery. Navarro discussed the issue with the scheduling department at Cermak and determined that he had an upcoming follow-up appointment at Cermak. She shared that information with Dr. Feldman and Dr. Mennella. Dr. Feldman then contacted Dr. Sumanas Jordan, a medical resident at the plastic surgery clinic. Dr. Jordan said that the clinic would attempt to schedule Turner's surgery at his next appointment on February 9.

A note from a follow-up visit at Cermak on February 9 indicated that Turner had been scheduled for surgery later that month, on February 25. That surgery did not take place. Again, there is no testimony explaining why that particular surgery was canceled.

4

The next day, however, Dr. Jordan scheduled Turner for surgery on March 31.

On March 22, 2016, Turner had a follow-up appointment at Cermak with physician assistant Gina Chung. Chung noted that Turner had been scheduled for surgery on February 2016 but that the operation had not taken place. She testified that she was unable to determine why the surgery did not proceed as scheduled. Chung stated, however, that when an inmate failed to undergo a scheduled surgery it was usually because the surgeon rescheduled it or because the department of corrections failed to transport the inmate.

Once again, Turner's surgery did not occur as scheduled on March 31, 2016. At a follow-up appointment at Cermak on April 25, the physician noted that his surgery had apparently been canceled. There is no evidence regarding the reason for this cancellation.

In June 2016, Turner left the Cook County Jail. He was briefly sent to Stateville Correctional Center and was then transferred to Robinson Correctional Center. He was released from Robinson on August 8, 2016. In November 2016, he returned to Stroger Hospital to undergo a septoplasty and turbinate reduction. Turner testified that he remained in substantial pain after the surgery, although he stated that the operation improved his breathing and lessened his pain a little.

Turner filed this suit in March 2017, alleging that Cook County and several of his physicians were deliberately indifferent to his serious medical need in violation of the Eighth and Fourteenth Amendments. He later amended his complaint to name additional individual defendants, though he voluntarily dismissed his claims against Dr. Kenya Key, Dr. David Kelner, and Dr. Nneka Jones Tapia in October 2018. The

remaining defendants have moved for summary judgment.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). The Court views the evidence and draws all reasonable inferences in Turner's favor. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). To survive summary judgment, Turner must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

In their briefs, both parties analyzed Turner's claims under the Eighth Amendment, which requires a plaintiff to show that prison officials were deliberately indifferent to a serious medical need. *Id.* at 1048–49 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). But because Turner was a pretrial detainee at all relevant times, the less stringent standard of the Fourteenth Amendment applies to his claims. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). In *Miranda*, the Seventh Circuit held that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to [an] objective unreasonableness inquiry." *Id.* After briefing on the motion for summary judgment was complete, the Court afforded both parties the opportunity to submit supplemental briefs that applied the appropriate standard, though only Turner did so.

Under *Miranda*, Turner's due process challenge to his medical care has two elements. First, he must show that the defendants acted purposefully, knowingly, or

6

recklessly. *See id.* at 353. Second, he must show that the defendants' conduct was objectively unreasonable. *See id.*; *see also McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). This standard "requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886.

### A. Injury caused by the delay

Both Cook County and the individual defendants argue that no reasonable jury could find that the delay in performing surgery caused Turner an injury. To withstand summary judgment, Turner must "present verifying medical evidence that the delay in medical care caused some degree of harm." *Miranda*, 900 F.3d at 347 (internal quotation marks omitted). It is undisputed that Turner suffered a facial fracture in October 2015 but did not undergo a rhinoplasty until November 2016, more than one year after the fracture and about five months after he was released from custody. Turner argues that the failure to perform surgery sooner caused him unnecessary pain.

The defendants contend that there is no evidence that this delay caused Turner any additional harm. They point to Dr. Szczerba's testimony that it was appropriate to perform the surgery between six months to a year after the initial injury and that the purpose of the operation was not to reduce pain but to improve breathing. They also cite testimony by Turner's expert, Dr. John McMahan, who stated that he did not believe that any physician at Stroger deviated from the standard of care in scheduling Turner's surgery.

The defendants are not entitled to summary judgment on this point. In the Eighth

7

Amendment context, "[a] delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015). Because "pretrial detainees are entitled to at least [as] much protection" as convicted prisoners, *Miranda*, 900 F.3d at 350, an unnecessary delay in treatment also constitutes an injury under the Fourteenth Amendment. In this case, the medical records reflect that Turner continued to experience serious pain for months after the initial injury. And during his deposition, Turner testified that after his rhinoplasty in November 2016, the pain in his nose improved "a little." Turner Dep., dkt. no. 76–13, at 26:1–2. Construing this testimony in Turner's favor, a reasonable jury could find that delay in Turner's surgery unnecessarily prolonged his pain. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (holding that a combination of the plaintiff's testimony and his medical records amounted to verifying medical evidence that a delay in treatment caused his injury). The fact that Turner testified that he continued to experience substantial pain even after the surgery does not undermine that conclusion; the jury could reasonably infer that his pain remained unnecessarily severe in the interim.

**B.      Individual defendants**

The individual defendants argue that a jury could not reasonably find that they were deliberately indifferent to Turner's serious medical need. As the Court mentioned above, however, Turner need show only that the defendants' conduct was purposeful, knowing, or reckless, rather than deliberately indifferent to a serious medical need. *See Miranda*, 900 F.3d at 353. Although the defendants declined to submit additional briefing applying the Fourteenth Amendment standard, the Court will apply the

appropriate standard in the following discussion.

The individual defendants broadly comprise two categories: medical professionals who personally treated Turner and county employees who acted in administrative capacities. The administrative defendants are Dr. Elizabeth Feldman, the divisional chair for clinic operations at Cermak; Dr. Connie Mennella, the chair of correctional health department at Cermak; and Sandra Navarro, the deputy director of risk management at the Cook County Health and Hospitals system. The medical defendants are the individuals who personally treated Turner at Cermak: Dr. Reena Paul, Dr. Stamatia Richardson, and Gina J. Chung, a physician assistant.

Turner contends that the individual defendants acted unreasonably because they failed to ensure that he received a timely surgery. He alleges that both the medical and administrative defendants were responsible for following up with Stroger Hospital regarding the scheduling of his surgery. He also points out that the administrative defendants became aware of the delay upon receiving the court orders and the communications from attorney Parts, and the medical defendants similarly knew from his treatment notes that he had not received his ordered surgery. He argues that a reasonable jury could find, based on this evidence, that the individual defendants knowingly or recklessly prolonged his pain by unreasonably failing to follow up regarding his surgery.

Turner has not introduced sufficient evidence to allow a reasonable jury to conclude that any individual defendant's unreasonable conduct caused his surgery to be delayed. It is undisputed that Turner was repeatedly scheduled for surgery and that each time, the surgery was canceled or rescheduled. But Turner has pointed to no

9

evidence that would permit a reasonable jury to find that any of the individual defendants had any ability to influence the scheduling of surgeries. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("[T]o be held individually liable [under section 1983], a defendant must be personally responsible for the deprivation of a constitutional right." (internal quotation marks omitted)). For their part, the defendants point to unrebutted testimony that the responsibility for scheduling surgeries at the plastic surgery clinic fell to the medical residents at Stroger Hospital. Although there is no evidence in the record that explains why Turner's surgeries in particular were canceled or rescheduled, multiple witnesses testified that medical residents made those decisions in consultation with Stroger doctors. One such resident, Dr. Michael Gart, testified that the residents maintained a list of patients who required surgery and scheduled those patients based on the urgency of the procedure and the availability of operating rooms and necessary staff. He further testified that although physicians at Cermak occasionally called to ensure that patients receive prompt appointments, they had no influence in scheduling surgeries.

Turner contends that the individual defendants had the power to influence the timing of his surgery, but the evidence he cites does not support that proposition. He relies on deposition testimony from witnesses who stated that doctors at Cermak could directly schedule appointments at Stroger's specialty clinics, including the plastic surgery clinic. But none of this testimony pertains to the scheduling of *surgeries*, for which Stroger's medical residents were responsible.

The Court concludes that, without evidence that the individual defendants had any power to influence the timing of his surgery, no reasonable jury could conclude that

10

any of the individual defendants acted unreasonably and caused his treatment to be delayed. Summary judgment for the individual defendants is therefore appropriate.

**C.     Cook County**

There are three possible bases for municipal liability under section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Turner argues that the county had a widespread practice in which primary care physicians failed to follow up to ensure that their patients received timely treatment from outside providers. He also contends that gaps in the county's policies concerning the processing of court orders and multiple grievance forms caused his injury. Finally, he argues in the alternative that Dr. Mennella and Dr. Feldman were final policymakers and were deliberately indifferent to his injuries.

The county first argues that it cannot be liable under *Monell* if summary judgment is granted in favor of the individual defendants. This argument misstates the law. "[A]n organization might be liable even if its individual agents are not. . . . [I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017). "The central question is always whether an official policy, however expressed[,] . . . caused the constitutional deprivation." *Id.* at 379. Resolving the county's motion therefore requires determining whether Turner has presented evidence from which a reasonable jury could find that the county's policies were "the 'moving

force' behind the injury alleged." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). Turner must also show that the county acted with the "requisite degree of culpability"—that is, deliberate indifference to the known or obvious consequences of its actions. *Lapre v. City of Chicago*, 911 F.3d 424, 430 (7th Cir. 2018); *see also Brown*, 520 U.S. at 409 (explaining that a municipality is liable for a violation of federal rights that is the "highly predictable consequence" of its policies). Similarly, to the extent Turner alleges that the county is liable for gaps in its policies, he must point to evidence that the municipality did not "have procedures in place for addressing a known risk of serious harm." *Lapre*, 911 F.3d at 430.

### 1. Failure to follow through on scheduling

Turner argues that the county had a widespread practice of failing to follow up to ensure that medical providers outside the jail provided timely treatment. First, he appears to contend that the county may be liable solely because its employees (including those at Stroger) unreasonably delayed his medical care. But municipal liability under *Monell* is not a form of vicarious liability—rather, Turner must point to evidence that the county's policy or custom caused his injury. *See, e.g.*, *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014).

Elsewhere in his brief, Turner does point to a policy or practice that might arguably support his *Monell* claim against the county. Specifically, he argues that the county had a custom of failing to follow up on the scheduling of off-site medical procedures. He contends that despite the county's written policy requiring medical providers at Cermak to follow up regarding detainees' treatment by off-site medical providers, there was a widespread failure to conduct necessary follow-up. He relies on

12

a report prepared by a court-appointed monitor, who found in April 2016 that the process of entering orders from specialty clinics into Cermak's records system "is not consistently followed." Esmaeil Report, Turner's Ex. 24, dkt. no. 103–25, at 52–53.

But Turner has not pointed to evidence from which a jury could reasonably infer that the county's alleged practice of failing to enter off-site orders into its system caused his delay in treatment. First, the monitor found that patients were "referred timely by the provider to the specialty clinic and received an appointment as needed" and that Cermak was therefore in substantial compliance with its obligations. Id. at 65. And the practice that the monitor found was "not consistently followed" related to the entry of orders from specialty clinics that required follow-up care from the doctors at Cermak, not additional procedures at the specialty clinic. Id. at 52–53. The monitor's report therefore does not support a reasonable inference that the county had a widespread practice or custom that caused Turner's surgery to be delayed.

In addition, Turner has not introduced evidence from which a reasonable jury could find that the alleged practice of failing to follow up in scheduling surgeries caused his surgery to be delayed. As discussed above, there is no evidence that physicians at Cermak had any role in scheduling surgeries, which was handled by medical residents at Stroger. The evidence therefore does not support a reasonable inference that the medical professionals at Cermak could have influenced the timing of Turner's surgery even if they had followed up with the residents at Stroger. And Turner does not allege—let alone point to evidence—that any of the county's policies or practices governing the scheduling of surgeries within Stroger's plastic surgery clinic caused his surgery to be delayed. Thus, although a reasonable jury could conclude that *some*

13

county employee (namely one or more Stroger physicians) caused the delay, the evidence does not support a reasonable inference that the county is liable for that delay through its policies. See Brown, 520 U.S. at 406–07 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.").

### 2. Gaps in policies

Turner next argues that there were gaps in the county's policies concerning the scheduling of medical treatment that caused his surgery to be delayed. "[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." Glisson, 849 F.3d at 381. Turner contends that the county failed to implement appropriate policies for responding to court orders regarding medical care. He also alleges that the county had a gap in its policies regarding the handling of multiple grievances and health service request forms that relate to a single medical complaint.

As with the county's alleged custom of failing to follow up on the scheduling of surgeries, Turner has not introduced evidence from which a reasonable jury could infer that these alleged gaps in the county's policies caused his delayed treatment. As the Court previously discussed, the responsibility for scheduling surgeries at the plastic surgery clinic fell to the medical residents at Stroger. There is no evidence to support the inference that different policies regarding court orders or grievances would have influenced those treatment decisions. To the contrary, Dr. Szczerba testified that a court order would not have influenced his decision about the appropriate time to perform

14

the surgery because he based that judgment on his medical evaluation of Turner. *See, e.g., Miranda*, 900 F.3d at 344 (upholding summary judgment for the defendant county because "there was no reason to think that additional guidance" in the county's policies "would have made a difference" to the plaintiff's health).

In addition, no reasonable jury could conclude that the failure to enact the relevant policies constituted deliberate indifference. Turner does not explain what he believes the county should have done differently upon receiving the court orders and grievances, let alone point to evidence that its failure to enact a particular policy amounted to disregard for a "known or obvious consequence of [its] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Lapre*, 911 F.3d at 430. At the summary judgment stage, Turner is required to identify specific facts establishing a material issue for trial. *Giles*, 914 F.3d at 1048. He has not met his burden to show that there is a genuine dispute that the county was deliberately indifferent.

### 3. Final policymakers

Finally, Turner argues that Dr. Mennella and Dr. Feldman were final policymakers and that a reasonable jury could find the county liable under section 1983 based on their deliberate indifference to Turner's serious medical need. Under this theory, the county may be liable under *Monell* in this case only if the policymaker acted "with deliberate indifference as to [the] known or obvious consequences" of his conduct. *Brown*, 520 U.S. at 407 (internal quotation marks omitted); *see also Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018) ("[T]he plaintiff must show that the local policymakers were, at a minimum, deliberately indifferent as to the known or obvious consequences of their inaction with respect to the custom." (internal quotation marks

15

omitted)). Even assuming that Dr. Mennella and/or Dr. Feldman were final policymakers, therefore, Turner can withstand summary judgment only by pointing to evidence from which a reasonable jury could find that they were deliberately indifferent. In this context, Turner's "theory of *Monell* liability rests entirely on individual liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). The Court has already concluded that a reasonable jury could not find that Dr. Mennella and Dr. Feldman acted unreasonably, let alone that they were deliberately indifferent. *See Walgren v. Heun*, No. 17–cv–04036, 2019 WL 265094, at *10 n.5 (N.D. Ill. Jan. 17, 2019) ("[I]t necessarily follows that conduct that is not objectively unreasonable falls short of deliberate indifference."). The county is therefore entitled to summary judgment on Turner's claim that the county is liable through the deliberate indifference of its policymakers.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 74] and directs the Clerk to enter judgment in favor of defendants and against plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 4, 2019